STATE of Tennessee, Appellee,

v.

Michael Arthur BORDIS, Sr., Appellant.

Court of Criminal Appeals of Tennessee, at Nashville.

Feb. 24, 1995.

Permission to Appeal Denied by Supreme Court July 10, 1995.

---

Mark J. Fishburn, Nashville, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Nashville, TN, Kathy Morante Principe, Associate Solicitor General, Nashville, Nicholas Bailey and Katrin Miller, Asst. District Attorneys General, Nashville, for appellee.

## OPINION

WADE, Judge.

The defendant, Michael Arthur Bordis, Sr., was convicted of first degree murder and sentenced to a term of life imprisonment. In addition to his challenge to the sufficiency of the evidence, the defendant submits the following issues for appellate review:

(1) whether the trial court erred by admitting into evidence photographs of the victim; and

(2) whether the trial court erred by allowing as evidence prior acts of misconduct on the part of the defendant.

We find the evidence insufficient to support a first degree murder conviction; we also hold that the failure to exclude certain of the evidence requires a reversal of the conviction and a remand for a new trial.

Between 2:00 or 3:00 A.M. on Saturday, April 6, 1991, the defendant approached Metro Police Officers Raymond Rader and Ronnie Barnes in a Nashville parking lot and asked for help because his infant child had stopped breathing. The officers followed him back to his apartment and found the defendant's wife, Claudette Pittman Bordis,[1]

---

1. Claudette Bordis was tried separately and convicted of the first degree murder of the victim.

crying and holding her three-month-old son, Michael Bordis, Jr., in her arms. Officer Rader described the infant as having an "ash color ... kind of grayish," "cold to the touch," and with his arms in an upright position. There was no pulse. Doctors later determined that the victim had died of malnutrition and dehydration.

Officer Rader, who described the defendant as "a little excited," examined each of the two bedrooms in the apartment. The second contained a crib and a single-sized bed/playpen where the victim's half-brother Matthew Pittman, age 3 or 4, was found asleep. Because the room had no lights, the officer used a flashlight. There was a bottle in the baby's crib. The room had the smell of feces with an ammonia-type odor "like a lot of urine had been spilled." The officers described the room as "trashy." There was feces in a plastic dish in the window sill. While Matthew did not appear to be malnourished, he did have a black eye; and later, at the police station, Matthew ate two packages of crackers, two packages of doughnuts, and drank soft drinks.

Sergeant Barnes testified that the defendant told him "that the [victim] had not been eating very well lately." When asked about whether he had taken the victim to a doctor, the defendant indicated that he and his family had only recently moved to the area and did not yet have a doctor. Sergeant Barnes testified that the defendant showed little emotion during their conversations.

Detective Johnny Lawrence testified that he arrived at the defendant's apartment after the victim had been taken to the hospital. The defendant and his wife sat in the living room comforting each other; an older child, Matthew, was in their room. Initially, Detective Lawrence suspected that the victim had suffered infant death syndrome. When asked about the incident, the defendant explained that when he arrived at his home from work at about 2:30 A.M., he first observed his wife on the couch and then went to the bedroom to check on the children. He called his wife when he discovered something

was wrong and she attempted to resuscitate the victim. Meanwhile, the defendant left to get help.

Later, Detective Lawrence saw the victim's body at the hospital. He described his appearance as similar to photographs he had seen of starving children in Africa. After consulting with the doctor, Detective Lawrence instructed another officer to transport the defendant and his wife to police headquarters for more intensive questioning.

Detective Lawrence, Officer Steve Stone, and Investigator Jim Mason all testified that the first thing they noticed when entering the apartment was the smell coming from the children's room. Each observed trash throughout their bedroom, smears of feces over portions of an ice chest and the walls, the feces in the dish in the window sill, and a training potty turned over on the floor. A bottle in the baby's bed apparently contained old or spoiled milk. There also appeared to be either vomit or milk on the blanket in the crib. Officers noted that there was rice cereal for babies, baby food and a half empty can of baby formula in the apartment.

Steve Proesch, an emergency medical technician who had been called to the defendant's apartment, testified that the victim was pale and emaciated by the time of his arrival. Rigor mortis and liver mortis had set in. Proesch described the parents as "upset."

Eureva Elmore, a Social Counsellor for the Department of Human Services, interviewed the defendant and his wife only hours after the discovery of the victim's death. Portions of the statement she acquired included the following information:

> [The defendant] told [her] that he had come home ... [about 2:30] a.m. that morning, and had gone in to check on the baby, which was something that he normally did, that as soon as he saw the baby, he realized something was wrong. And he called for his wife to come in there. She ... then gave mouth to mouth resuscitation and asked him to go get the police. He said that since they didn't have a tele-

On appeal, the conviction was reversed and a new trial granted based upon inadequate jury instructions. *See State v. Claudette Pittman Bordis*, No. 01C01–9211–CR–00358, 1994 WL 672595 (Tenn.Crim.App., at Nashville, December 1, 1994).

phone, he had walked down to use the pay phone but had ... run into two police officers who came back to the home with him.

\* \* \* \* \* \*

He [also stated] that they had noticed the baby had been thin, but they didn't think ... the baby had any medical problems.

\* \* \* \* \* \*

He told [her] that he had ... been investigated in Illinois for slapping Matthew.

\* \* \* \* \* \*

He said that they kept very little food in the house because they mostly ate out.

When asked about the appearance of the children's room, the counsellor described it as "very nasty" and "totally unke[m]pt." The defendant told her that he had noticed that the baby was losing weight but thought that it was due to his formula and that a change had been recently made. The defendant also told her that he believed the victim to be doing better on the new formula.

During this interview of the defendant, Claudette Bordis responded to many of the questions asked. She told Ms. Elmore that she had fed the victim at 8:00 P.M., only hours before his death, and then put him to bed. She indicated that she thought the victim might be allergic to milk and confirmed that they had changed his formula some two or three weeks before his death. She claimed that the victim had consumed from two to six bottles of the formula per day and acknowledged that the defendant, who from all appearances rarely changed or bathed the victim, seldom saw the victim without clothing.

Ms. Elmore, who spent the day the body was discovered with the victim's older brother, Matthew, described Matthew as constantly eating or wanting something to eat.

Dr. Julia Goodin, Deputy Chief Medical Examiner for Middle Tennessee, performed the autopsy and found dehydration and malnutrition to be the cause of death. The victim's medical records indicated that he weighed 9 pounds and 6 ounces when he was born; at the time of the autopsy, the victim weighed approximately 7 pounds and 10 ounces. Dr. Goodin testified that the child was obviously malnourished. She described his skin as just "lying on top of the bone" with no fat at all. Other visible signs of malnutrition were protruding ribs, a "scaphoid and sunken in abdomen," a drawn face, and sunken eyes. A bald spot on the back of the victim's head indicated that he had rarely been moved. Dr. Goodin testified that the victim would have been very lethargic prior to his death and observed that his green abdomen was a sign that decomposition had begun by the time the body was discovered. At the time of the autopsy, it was Dr. Goodin's opinion that the child had been dead for at least 24 hours; this would have made the estimated time of death at 10:30 A.M. the previous day, some sixteen hours before the discovery of the body. She did not think it was possible that the victim had been fed, as indicated by Ms. Bordis, at 8:00 P.M. the previous evening, only six or seven hours before the arrival of the police.

Dr. Goodin noted that there were several internal signs of malnutrition and dehydration. The victim's body cavities were dry and the organs were smaller than normal. Other than the signs of malnutrition, the victim's organs appeared to be functional. There was no indication of any disease. The examination of the stomach established that the child had not been recently fed. Autopsy results ruled out all other possible causes of death. In Dr. Goodin's view, the child would have been able to accept nourishment had it been supplied.

The defendant testified on his own behalf at trial. He stated that he had moved from Illinois to Nashville in mid-December of 1990 and was employed as an assistant manager at Wendy's. In January of 1991, two weeks after his wife gave birth to the victim, Ms. Bordis and her two sons moved to Nashville to join the defendant. During direct examination by his defense counsel, the defendant admitted that he had once slapped Matthew when they lived in Illinois and had talked to Child Services there about it. He testified, however, that his relationship with Matthew had improved and that his relationship with the victim was good. He stated that he and

his wife had argued about how she kept house but that he "had learned to live with the fact that that's the way [his] house was going to be." He believed that she had the time to keep the house clean and that he preferred not to work all day and then come home and perform what he believed to be her duties.

The defendant also testified that he had held the victim soon after his birth and helped feed him. He explained, however, that later he had unintentionally dropped the victim as he removed him from his crib and had been afraid to try to hold him since that occurrence. The defendant acknowledged that he noticed the victim was losing weight about one month prior to his death. When he inquired as to the cause, his wife told him that the victim was not accepting food very well and that they needed to change his formula. On cross-examination, the defendant admitted that he had not taken the victim to the doctor because, in part, he feared he might be jailed for neglect.

The defendant testified that his wife believed that the formula change had been helpful. He claimed that he saw his wife take bottles to the victim regularly and asserted that there was always food in the house for the victim to eat. He explained that he had not seen the victim naked, as the body appeared in police photographs, and that the clothing worn by the victim had disguised his poor health.

On both direct and cross-examination, the defendant acknowledged that he and his wife often went to bars and left the children at home alone. An admitted alcoholic, the defendant said his wife had provided regular assurances that the children were "all right." The defendant also acknowledged that he had been arrested on three separate occasions while he and his wife were out together. He said his third arrest, for DUI, was very early on a Friday morning before the discovery of the victim's body on the following Saturday morning. The defendant testified that he had been released from jail at about 6:30 P.M. Friday, some seven or eight hours before he learned of the victim's condition. The defendant testified that as soon as he got out of jail, he went home, got ready for work, and left without checking on either of the two children. He claimed that before his departure, he had inquired about a chair blocking the children's bedroom door; his wife had explained that she had used the chair to keep her older son secured during the time she had driven to pick up the defendant. The defendant testified that when he got home from work at about 2:30 A.M., the chair was still tied to the door. His wife was on the couch when he looked in on the children. He saw that the victim had one eye open and one closed. He called to his wife, went for help, and soon located Officers Rader and Barnes.

The defendant claimed that he had "totally" relied on his wife to see that the children were fed. He testified that he had fed the victim only two or three times and admitted that he had discussed with his wife allowing Matthew to be adopted. The defendant conceded that he had been neglectful of the children but denied any plan or conspiracy to kill the victim.

■ This factual summary, in our view, fairly reflects the testimony at trial. In this appeal, the defense initially claims that the evidence was insufficient to establish the elements of either first degree murder, second degree murder, or voluntary manslaughter. While, as indicated, conceding extreme neglect, the defendant submits that the evidence at trial was sufficient to establish only the offense of criminally negligent homicide which, under our 1989 act, replaced the crime of involuntary manslaughter. In response, the state asserts that the surrounding circumstances support the conclusion that the defendant purposefully withheld nourishment for as much as a month. It assails the character of the defendant and, with obvious good cause, condemns his failure to provide even the barest essentials to sustain the life of the victim. And, while the state fails to specifically address the requisite element of premeditation in its brief, it insists that the related course of events justified inferences of intent and deliberation.

■ On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences

which might be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as triers of fact. *Byrge v. State,* 575 S.W.2d 292, 295 (Tenn.Crim. App.1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984); Tenn. R.App.P. 13(e).

■ We are also guided in our review by other well-established principles. A crime may be established by the use of circumstantial evidence only. *State v. Tharpe,* 726 S.W.2d 896, 899–900 (Tenn.1987); *Marable v. State,* 203 Tenn. 440, 451–52, 313 S.W.2d 451, 457 (1958). However, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude [beyond a reasonable doubt] every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford,* 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 484, 470 S.W.2d at 613.

Now, having recited our scope of review, we will turn to the applicable statutory law. At the time of the offense in 1991, first degree murder was defined as follows:

**First degree murder.—(a) First degree murder is:**

(1) An *intentional, premeditated* and *deliberate* killing of another; or

(2) A *reckless killing* of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson,

rape, robbery, burglary, theft, kidnapping or aircraft piracy; or

(3) A *reckless killing* of another committed as the result of the unlawful throwing, placing or discharging of a destructive device or bomb.

(b) A person convicted of first degree murder shall be punished by death or by imprisonment for life.

Tenn.Code Ann. § 39–13–202 (Supp.1990) (emphasis added). Initially, it was the state's theory that the critical element of premeditation could be inferred as set forth in Tenn.Code Ann. § 39–13–201 (Supp.1990):

**Criminal homicide.—(a)** Criminal homicide is the unlawful killing of another person which may be first degree murder, second degree murder, voluntary manslaughter, criminally negligent homicide or vehicular homicide.

(b) The following definitions apply in this part:

(1) "Deliberate act" means one performed with a cool purpose; and

(2) "Premeditated act" means one done after the exercise of reflection and judgment. Premeditation may include instances of homicide committed by poison or by lying in wait. *Premeditation may be inferred if the person killed is a child less than thirteen (13) years of age and the child's death is the proximate result of a protracted pattern or multiple incidents of the infliction of serious bodily injury on the child by the defendant.*[2]

(Emphasis added).

Just before the trial, however, our supreme court issued an opinion in *State v. Hale,* 840 S.W.2d 307, 308 (Tenn.1992), holding that "the provisions of the 1988 amendment to the first degree murder statute[, Tenn.Code Ann. § 39–13–202,] ... unconstitutionally deprived the defendant of due process in contravention of the law of the land provisions of Article I, Sec. 8 of the Tennessee Constitution." That 1988 amendment, which had been repealed and replaced by the language of Tenn.Code Ann. § 39–13–201, as quoted above, provided as follows:

**2.** The last sentence of this act was omitted by a legislative amendment taking effect July 1, 1991.

It shall also be murder in the first degree to kill a child less than thirteen (13) years of age, if the child's death results from one (1) or more incidents of a protracted pattern or multiple incidents of child abuse committed by the defendant against such child, or if such death results from the cumulative effects of such pattern or incidents.

Tenn.Code Ann. § 39–13–202(a)(2) (Supp. 1988). Based on the similarity of the content of the 1989 amendment of § 39–13–201 to the statutory language found unconstitutional in *Hale,* the state withdrew its reliance upon the "premeditation inference" and rested its theory entirely upon the proposition that the defendant had intentionally, premeditatedly, and deliberately caused the death of the victim. *See* Tenn.Code Ann. § 39–13–202(a)(1). Thus, neither of the provisions passed in 1988 or 1989 relating to a victim "less than thirteen (13) years of age" was of any benefit to the state in this case. *See* Wade, *The Trexler Saga: Hale and Middlebrooks,* 23 Mem.St.U.L.Rev. 319 (1993). Moreover, the state had the burden of showing more than mere "recklessness" on the part of the defendant because the charge did not involve either a felony murder or a killing due to the discharge of a "destructive device." *See* Tenn.Code Ann. § 39–13–202(a)(2) and (3). In consequence, the sufficiency of the convicting evidence, for purposes of this appeal, depends entirely upon whether the state was able to prove each and every one of the essential elements: intent, premeditation, and deliberation.

We begin our analysis with a review of each of the three elements required by the law to support a first degree murder conviction. An "intentional" act is statutorily defined:

> "Intentional" refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

Tenn.Code Ann. § 39–11–302(a) (Supp.1990). Sentencing Commission Comments describe conduct as intentional "when the defendant wants to do the act or achieve the criminal objective." So, from all of this, it would appear that the burden of the state at trial (to show first degree murder) was to prove that the defendant had consciously engaged in conduct which resulted in the death of the victim (intentionally) and that he perpetrated the killing with a cool, calculated purpose (deliberately) and after reflective judgment (premeditatedly).

At common law, a homicide, a death caused by the intentional act of another, was presumed to be second degree murder. *Witt v. State,* 46 Tenn. 5, 8 (1868). Under current statutory law, the state must still prove both premeditation and deliberation beyond a reasonable doubt in order to raise the offense to first degree murder. *State v. Brown,* 836 S.W.2d 530, 543 (Tenn.1992).

In *Brown,* our supreme court held that the element of deliberation contemplates a lapse of time between the decision to kill and the killing. "[T]he deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait—the cool purpose must be formed and the deliberate intention conceived in the mind, in the absence of passion, to take the life of the person slain." *Id.* at 539 (quoting *Rader v. State,* 73 Tenn. 610, 619–20 (1880)). In order to convict a defendant for first degree murder, a jury must find that the defendant killed with coolness and after reflective thought. *State v. West,* 844 S.W.2d 144, 147 (Tenn.1992); *see also State v. Brooks,* 880 S.W.2d 390, 392–93 (Tenn.Crim.App.1993).

No specific time is required to form the requisite deliberation. *State v. Gentry,* 881 S.W.2d 1, 3–4 (Tenn.Crim.App. 1993). Deliberation is present when the circumstances suggest that the murderer contemplated the manner and consequences of his act. *West,* 844 S.W.2d at 147. Though similar, deliberation and premeditation are defined separately and are distinct elements. *See* Tenn.Code Ann. § 39–13–201(b); *see also Brooks,* 880 S.W.2d at 392–93. They may be inferred from the circumstances where those circumstances affirmatively establish that the defendant premeditated his assault and then deliberately performed the act. *State v.*

*Richard Nelson,* No. 02C01–9211–CR–00251, 1993 WL 413743 (Tenn.Crim.App., at Jackson, Oct. 14, 1993). This court has previously held that the holding in *Brown* requires "proof that the offense was committed upon reflection, 'without passion or provocation,' and otherwise free from the influence of excitement" before a second degree, intentional murder can be elevated to murder in the first degree. *State v. David L. Hassell,* No. 02C01–9202–CR–00038, slip op. at 3, 1992 WL 386311 (Tenn.Crim.App., at Jackson, Dec. 30, 1992).

One respected authority provides some insight into the nature of proof required before a jury might properly infer either premeditation or deliberation:

(1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, *planning activity;*

(2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and

(3) facts about the *nature of the killing* from which it may be inferred that the manner of the killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 W. LaFave and A. Scott, Jr., *Substantive Criminal Law* § 7.7 (1986) (emphasis in original) (footnote omitted). And, our court has held that the elements of deliberation and premeditation are questions for the jury and may be inferred from the manner and circumstances of the killing. *Gentry,* 881 S.W.2d at 3. Still, a jury may not engage in speculation.

If any of the elements for first degree murder are absent, a lesser grade of homicide may apply. Second degree murder is defined very simply as the "knowing killing of another." Tenn.Code Ann. § 39–13–210(a)(1) (Supp.1990). "Knowing" is also statutorily defined:

"Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to the result of the person's conduct when the person is *aware that the conduct is reasonably certain to cause the result.*

Tenn.Code Ann. § 39–11–302(b) (Supp.1990) (emphasis added). Sentencing Commission Comments suggest that the defendant's conduct is "knowing" when he "is aware of the conduct or is practically certain that the conduct will cause the result, *irrespective of his ... desire that the conduct or result will occur*" (emphasis added).

Voluntary manslaughter is the next lesser grade of homicide. It is defined by statute as "the intentional or knowing killing of another in a state of passion produced by adequate provocation...." Tenn.Code Ann. § 39–13–211 (Supp.1990). Finally, criminally negligent homicide, which has replaced the crime of involuntary manslaughter under our prior law, is defined as "negligent conduct which results in death." Tenn.Code Ann. § 39–13–212 (Supp.1990).

Unfortunately, these facts do not neatly fit into any of the four grades of homicide possible. We can eliminate voluntary manslaughter; there is no hint that this killing was the result of any claimed or perceived provocation. Thus, first degree murder, second degree murder, and negligent homicide appear to have been the only possible alternatives. *See State v. Walker,* 893 S.W.2d 429, 431 (Tenn.1995).

Our research has been extensive. We have examined how each of the other states has addressed facts similar to these. A number of cases support the view that, ordinarily, there is a case of murder when the death is the direct consequence of a willful omission of a parent to feed his or her child, but that if the omission is not willful and arises out of neglect only, it is manslaughter. *See* Annotation, *Homicide by Withholding Food, Clothing, or Shelter,* 61 A.L.R.3d 1207, 1211 (1975). As indicated, manslaughter, if not voluntary, is now known as criminally negligent homicide in this state.

There are several cases where the evidence was held to be insufficient to support a conviction for murder. A Montana court held that while a three-month-old daughter

had died of starvation due to her defendant mother's failure to provide food and care, there was no direct evidence of a willful withholding. *State v. Rivers*, 133 Mont. 129, 320 P.2d 1004 (1958). That second degree murder conviction was set aside on the basis that there was inadequate proof of a specific intent to take life but the court ruled that the failure on the part of the mother to sufficiently feed her infant child might be the basis for a manslaughter conviction on retrial. *Id.*

Other jurisdictions identify the critical issue to be one of intent. That is, where the defendant acts willfully and intentionally, the elements of common law murder are met. *See, e.g., Pallis v. State*, 123 Ala. 12, 26 So. 339 (1899); *Albright v. State*, 50 Ala.App. 480, 280 So.2d 186 (1973). In those cases, the term intent (or willfulness), in circumstances similar to these, has been described as a "malicious omission of the performance of a duty" to care for an infant child as opposed to "neglect only." *Biddle v. Commonwealth*, 206 Va. 14, 20, 141 S.E.2d 710, 714 (1965). There must be capacity, means and ability to perform that duty, else the omission is generally not criminal. *See, e.g., Jones v. United States*, 308 F.2d 307 (D.C.Cir.1962); *Bliley v. State*, 42 Ala.App. 261, 160 So.2d 507 (1964); *Commonwealth v. Hall*, 322 Mass. 523, 78 N.E.2d 644 (1948).

There are also cases of this nature wherein first or second degree murder convictions have been upheld. In one such instance, the jury found that a mother had placed her illegitimate two-month-old child in an attic and intentionally withheld food and liquids so as to cause death. *Commonwealth v. Hall*, 322 Mass. 523, 78 N.E.2d 644 (1948).

In the *Biddle* case, a Virginia court held that if death is the direct consequence of a malicious omission of the performance of a duty, such as that of a mother to feed her child, the case was one of murder but, if the omission was not willful and arose out of neglect only, it was manslaughter. Some facts were similar to those in this case:

> When the detectives visited defendant's home on the night of January 22, 1964, Henley observed the deceased baby's body in an extreme condition of malnutrition, and when he unpinned her diaper he found blood spots on it and on her private parts from diaper rash. He observed another infant lying on newspapers in a bassinet, with a leather jacket over her, and her diapers were wet and dirty and there was a rash on her buttocks. In the kitchen the detectives saw a large, open can of Pet milk, with a saucer covering the top, and food on the stove which appeared to have been there for several days.
>
> Medical testimony shows that when the baby was born on October 18, 1963, she "seemed to be perfectly healthy." There was also evidence that the baby weighed 5 pounds 8 ounces at birth.
>
> Testimony of the medical examiner reveals that he made a post-mortem examination of the baby's body two days after her death; that she weighed 4 pounds 5½ ounces; that the intestinal tract and stomach were entirely empty, and that the body was dehydrated. It was his opinion that the child had not been fed for several days.

\* \* \* \* \* \*

> ■ Here, the defendant [wife] was harassed by her husband's accusation that none of her children [were] his, and the baby's feedings appeared to depend upon how she and her husband got along. When the relationship between them was pleasant she fed the baby, but when it was not she neglected her. She had milk in the house to feed the baby the night it died, but it is apparent from the medical examiner's testimony that she had not fed her for several days....

206 Va. at 21, 141 S.E.2d at 714–15. That court held that whether the defendant was guilty of manslaughter or willful, deliberate and premeditated murder depended upon the nature and character of the act or acts which resulted in a child's death. The first degree murder conviction was reversed on the basis that the proof failed to show beyond a reasonable doubt that the defendant willfully and maliciously withheld food and liquids from a three-month-old infant.

In California, a second degree murder conviction was upheld when the defendant admitted that he was aware that his son was

literally starving to death for at least two weeks and where an expert witness testified that there was no food in the baby's digestive system. *People v. Burden*, 72 Cal.App.3d 603, 140 Cal.Rptr. 282 (1977). In a Maryland case, the element of malice, similar to our requirement of intent, was inferred in the case of *Simpkins v. State*, 88 Md.App. 607, 596 A.2d 655 (1991), when the parents left a two-year-old confined to a crib for five days without any food or water.

Murder convictions in Texas have also been upheld where the evidence established that the parent ignored a two-year-old child who, according to medical evidence, suffered from malnutrition for six months to a year prior to her death. *Harrington v. State*, 547 S.W.2d 616 (Tex.Crim.App.1977); *Harrington v. State*, 547 S.W.2d 621 (Tex.Crim.App. 1977). In the prosecution of a sixteen-year-old mother for the death of her newborn child, a Virginia court held that the evidence was insufficient to support willfulness, malice, deliberation, or premeditation when the mother, who had given live birth at home, left the infant unattended for seven hours before removing the corpse to a public dumpster. *Vaughan v. Commonwealth*, 7 Va.App. 665, 376 S.E.2d 801 (1989). In several cases with facts similar to those here, manslaughter convictions have been upheld when a parent or parents merely neglected infant children (as opposed to having intentionally done so) to the point of starvation. *See State v. Rupp*, 120 Ariz. 490, 586 P.2d 1302 (1978); *Faunteroy v. United States*, 413 A.2d 1294 (D.C.1980); *State v. Wright*, 66 N.J. 466, 332 A.2d 606 (1975); *Dillon v. State*, 574 S.W.2d 92 (Tex.Crim.App.1978).

All of these holdings are helpful to a point. There is some comfort in knowing how other states have resolved circumstances such as these. And yet, the Tennessee statutes, as quoted herein, ultimately dictate the result here. The 1989 act, by its own terms, "shall be construed according to the fair import of their terms, including reference to judicial decisions and common law interpretations...." Tenn.Code Ann. § 39–11–104. Thus we turn to the difficult chore of applying the statutory scheme to these facts.

The proof, in the light most favorable to the state, was that sometime after the birth of the victim, the defendant consciously chose not to perform some of the most basic duties of a custodial parent. For whatever reason, the defendant chose to rely entirely upon his wife for the care of the victim. While the defendant denied it, the victim's need for food and water was apparent. And finally, the defendant decided not to seek medical help and called police only after discovering the victim had stopped breathing.

These facts, however condemnatory of the character and intelligence of the defendant, fail to establish that the defendant either premeditatedly "killed another" or deliberately "killed another" within the terms of the statute. Tenn.Code Ann. § 39–13–202(a)(1). And, while the acts of the defendant to cease caring for the victim may fall within the statutory definition of "intentional," it is doubtful that the proof established an "intentional ... killing."

We shall attempt to explain. For a "premeditated killing," the defendant must have thought about, reflected upon, and contemplated the eventual death of the victim. As egregious as these circumstances are, the evidence was not so strong or so cogent as to exclude "every other reasonable hypothesis" except that of a planned murder. Under the terms of our statute, "premeditatedly," the adverb, defines "killed," the verb. So the state had the heavy burden of showing that intentional acts of omission by the defendant were so contemplated in advance so as to cause the death of the victim. Our standard of factual review, although limited, requires that we conclude that a rational trier of fact could have eliminated any other reasonable interpretation except for the thoughtful desire on the part of the defendant to kill the victim. We cannot find sufficient evidence to reach that conclusion.

Nor can we conclude that the circumstantial proof was sufficient, under the usual guidelines of review, to show that the defendant not only made a conscious decision to kill the infant victim but then, in a reasoned, purposeful, and deliberate manner carried out his designs. There are other reasonable interpretations of his inaction.

As indicated, LaFave and Scott suggest premeditation and deliberation can be shown by proof of motive, evidence of a plan or design to kill, or the very nature of death. Here, no motive is apparent from the record. There was no direct evidence that the defendant engaged in a plan, jointly or individually, to cause the death of the victim. Finally, the nature of the death, while particularly condemnatory, does not necessarily indicate whether the victim died from a purposeful design or supreme neglect. Absent something in the way of supportive proof along these lines, this court has little choice but to hold that the first degree murder conviction cannot stand.

As confirmed in *Brown,* of course, all of the elements must be independently shown in order to substantiate a first degree murder conviction. The third requisite element, "intentional," is akin to the term "knowing" but has a different statutory definition. A decision not to feed an infant child when there is a natural duty to do so may qualify as an "intended course of conduct ... a conscious objective to engage in the conduct or cause the result...." *See* Tenn.Code Ann. § 39–11–302(a). Again, however, the statute couples the term "intentional" with "killing," thereby limiting its application and it is doubtful that this proof rose to the level of a "conscious objective" to kill.

■ Thus, the question becomes whether these facts might have supported a conviction of murder in the second degree. To have done so, the proof must only have shown a "knowing" killing. Tenn.Code Ann. § 39–13–210(a)(1). That is, a rational trier of fact could have determined that the proof established that the defendant was "aware that [his] conduct [was] reasonably certain to have caused" the death of the victim. Tenn. Code Ann. § 39–11–302(b). If that test is met, whether the defendant desired the "result" is immaterial. And even though "knowing" also defines "killing" in our statutory scheme, our interpretation of the terms together would allow for a conviction of second degree murder in these circumstances.

The primary duty to care for an infant at common law was upon the mother. Times have changed, however, and so has the law.

*See Commonwealth v. Dornes,* 239 Mass. 592, 132 N.E. 363 (1921). Our legislature has defined the nature of parental duties:

> Fathers and mothers are *joint* natural guardians of their minor children, and they are *equally and jointly* charged with their care, nurture, welfare, education and support, and also with the care, management and expenditure of their estates. Fathers and mothers have *equal* powers, rights and *duties* with respect to the custody of their minor child or children....

Tenn.Code Ann. § 34–1–101(a) (emphasis added); *see also Brooks v. Brooks,* 166 Tenn. 255, 61 S.W.2d 654 (1933). This statutory duty has been of particular importance in prosecutions for involuntary manslaughter in other jurisdictions where the crucial question is one of recklessness. *See Jones,* 308 F.2d at 310; *Pallis,* 123 Ala. at 12, 26 So. at 339.

Here, the defendant admitted at trial that he was negligent in his failure to provide adequate food and nourishment to his son but consistently maintained that he had relied solely upon his wife to take care of the house and children. The fact that the defendant may have entrusted the care of his son to his wife, however, did not relieve him of his legally imposed parental responsibility to see that his child received proper and adequate care. *See Harrington v. State,* 547 S.W.2d 621 (Tex.Crim.App.1977) (father entrusting care of child to wife does not relieve him of his responsibilities unless it is shown that some other person had *sole* and *exclusive* care, custody, and control of minor child.); *cf. Rose Funeral Home v. Julian,* 176 Tenn. 534, 144 S.W.2d 755 (1940). The circumstances of the case, of course, are essential in determining the degree of culpability for such a failure to provide for an infant child.

Here, the defendant lived in the same household with the victim. In at least one of his statements to police, he acknowledged that it was his usual practice to check on the two children. He admitted that he knew at least one month before the victim's death that he was losing weight. Nonetheless, he chose not to keep up with the feeding of the child and knew that his wife would, at least

on occasion, simply "prop" a bottle in the crib, hopeful of the victim's use.

The mental state of the defendant must only have been "knowing." That is, that the defendant had an awareness "that the conduct [was] reasonably certain to have caused the result." Tenn.Code Ann. § 39–11–302(b). The proof was that the defendant performed none of the nurturing duties for as much as a month while the health of the victim slowly ebbed away through malnutrition and dehydration. The proof was that the deterioration was evident and the need for medical attention was apparent. And yet, by his own testimony, the defendant elected not to seek medical assistance—perhaps to avoid scrutiny from the authorities. This is not a case of the absence of the parent or even the total abandonment of the child to the care of another. The defendant retained at least the physical and legal custody and control and then chose, for whatever reasons, not to exercise his parental duties. To support a conviction of second degree murder, the proof need only show a "knowing killing of another." Tenn.Code Ann. § 39–13–210(a)(1). Here the state was successful in establishing that the defendant was something more than merely "reckless"—the essential element for criminally negligent homicide. And had there been no other error in the trial, this court would have no hesitation in upholding a conviction for a murder in the second degree.

## I

■ Next, the defendant asserts that the trial court erred in allowing photographs of the victim into evidence because of their prejudicial impact. The state, however, argues that the photographs, while admittedly unpleasant, are highly probative and not unfairly prejudicial. We agree with the position of the state.

The defendant challenged the admissibility of the photographs in a pretrial motion in limine which the trial court took under advisement after holding a hearing. At trial, however, the trial court held that the prejudicial effect of the photos did not substantially outweigh their probative value on the issue of intent. The court ruled that the pictures

allowed the jury to infer what the defendant knew or should have known based upon the appearance of the victim just prior to his death.

■ The admissibility of photographs is governed by Tennessee Rule of Evidence 403 and *State v. Banks,* 564 S.W.2d 947 (Tenn. 1978). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Tenn.R.Evid. 403. Whether to admit the photographs is within the discretionary authority of the trial court and will not be reversed absent a clear showing of an abuse. *State v. Dickerson,* 885 S.W.2d 90, 92 (Tenn.Crim.App.1993); *State v. Allen,* 692 S.W.2d 651, 654 (Tenn.Crim.App.1985).

Here, all of the photographs were taken after the victim's death. Because he had died from starvation, the physical appearance of the child was an important issue. As previously discussed, a first degree murder charge requires proof of intent and a deliberate and premeditated killing of another. *See* Tenn.Code Ann. § 39–13–202(a)(1). Here, the evidence was entirely circumstantial. Thus, a particularly heavy burden of proof was necessarily cast upon the state. The photographs illustrate the visible signs of malnutrition and dehydration testified to by the various witnesses. In that regard, the evidence was especially probative as to the intentional or the knowing nature of the defendant's conduct and tended to rebut claims that he was unaware of the victim's failing health. As indicated previously, the killing had to be "knowing" in order to qualify as second degree murder; that is, the defendant must have been reasonably certain that his continued failure to feed the child would result in the victim's death. In our view, the photographs were especially probative of his awareness of the possible results of his course of conduct and substantially outweighed any prejudicial effect. *See State v. Zagorski,* 701 S.W.2d 808, 813–14 (Tenn. 1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3309, 92 L.Ed.2d 722 (1986); *State v. Duncan,* 698 S.W.2d 63, 69 (Tenn.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986); *State v. Teague,* 645

S.W.2d 392, 397–98 (Tenn.1983); *see also People v. Burden,* 72 Cal.App.3d 603, 140 Cal.Rptr. 282 (1977); *Lewis v. State,* 180 Ga.App. 369, 349 S.E.2d 257 (1986). Thus, there was no error in the admission of the photos.

## II

The defendant also argues that the trial court erroneously failed to redact several instances of the defendant's prior acts of misconduct from his pretrial statements. The state first argues that some of the evidence was relevant to the issues of premeditation and deliberation and alternatively submits that any error in the admission of certain of the evidence had no adverse effect upon the verdict.

Tennessee Rule of Evidence 404(b) governs the admissibility of prior misconduct:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Generally, this rule is one of exclusion but there are, as stated, exceptions. *See State v. Parton,* 694 S.W.2d 299 (Tenn.1985); *Bunch v. State,* 605 S.W.2d 227 (Tenn.1980); *Carroll v. State,* 212 Tenn. 464, 370 S.W.2d 523 (1963); *see also State v. Rickman,* 876 S.W.2d 824 (Tenn.1994) (favorably citing both *Parton* and *Bunch* ). Most authorities suggest trial courts take a "restrictive approach of 404(b) ... because 'other act' evidence

carries a significant potential for unfairly influencing a jury." *See* Cohen, Paine and Sheppeard, *Tennessee Law of Evidence,* § 404.7 at 131. That perhaps best explains the traditional posture of the courts that any testimony of prior bad acts by a defendant, when used as substantive evidence of guilt of the crime on trial, are not usually permissible. *Parton,* 694 S.W.2d at 302–03. The exceptions to the rule are when the evidence is offered to prove the motive of the defendant, his identity, his intent, the absence of mistake, opportunity, or as a part of a common scheme or plan. *Bunch,* 605 S.W.2d at 229. Our supreme court recently spoke on the procedure used to determine whether a prior crime or bad act fell within an exception to the rule:

[I]f evidence that the defendant has committed a crime separate and distinct from the one on trial is relevant to some matter actually in issue in the case on trial, and if its probative value as evidence is not outweighed by its prejudicial effect upon the defendant, then such evidence may be properly admitted.

*State v. Howell,* 868 S.W.2d 238, 254 (Tenn. 1993) (citing *Bunch,* 605 S.W.2d at 229), *cert. denied,* —— U.S. ——, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994). In *Howell,* the court applied the balancing test to determine whether prior convictions for other crimes were admissible, as an exception to the general rule, for purposes other than the character of the defendant. *See also State v. Zagorski,* 701 S.W.2d 808 (Tenn.1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3309, 92 L.Ed.2d 722 (1986); *State v. Taylor,* 669 S.W.2d 694 (Tenn.Crim.App.1983).

■■■ Here, the defendant filed several pretrial motions in limine seeking to exclude portions of his statements to police. The state agreed not to introduce the first statement made by the defendant unless it became necessary for cross-examination purposes. One of the motions specifically addressed the second statement made to the authorities.[3] The defendant argued that the following excerpt was especially prejudicial:

---

3. One of the defendant's later motions addressed a significant amount of the possible evidence, including portions of his second taped statement.

When that motion was heard, those references were treated as having already been ruled upon in the hearing for a redacted statement.

A. . . . One of the things is uh . . . with Matthew . . . the one time I got in trouble with him. I didn't really get in trouble but it was raised against me.

Q. When you were charged with the physical abuse of Matthew in Illinois.

A. Right.

Q. Were you afraid that that would happen to you here and that [was] why you didn't go to the doctor?

A. That was one reason.

At a pretrial hearing, the defendant argued this portion of his statement should have been excluded under the general rule; he claimed that even if the statement was probative of intent, it should have been excluded because the prejudice of a prior physical abuse charge in Illinois substantially outweighed the probativeness. The defendant also pointed out that his fear of "getting into trouble" could be established by the state through other evidence and without any reference to the Illinois abuse charge. The prosecution countered that this excerpt was "the centerpiece" of its case. It claimed the evidence was probative of intent and deliberation because it showed that the defendant knew the child needed medical attention, had discussed the subject with his wife, but had not sought the help of a doctor for fear that he would get in trouble based on the prior incident. The state offered to concede through jury instructions that this evidence should not be considered as evidence of character, but only as evidence of his intent.

At the conclusion of the hearing, the trial court took this portion of the motion under advisement for a time. The court minutes indicate that the motion had been "complied with." A few days after the hearing, the trial court decided to allow the reference to the Illinois incident and chose to provide the jury with some limiting instructions.

While conceding that the reason he gave for failing to take the victim to a doctor was admissible to partly account for his inaction, the defendant claims the trial court should not have allowed reference to the child abuse

"charge." He cites another excerpt of his statement as a less prejudicial way of showing the same thing:

Q. You didn't take that child to the doctor cause you didn't want to go back to jail. That's the reason and you know it is. (Lawrence) [4]

A. Was afraid.

Q. That's the reason. You knew as soon as the doctor saw that child that you was gonna be locked up. (Lawrence)

A. I thought they would say it was my fault that . . .

Q. You've been knowing that for a month. (Lawrence)

Q. At least a month . . . right?

A. It's been about a month yes sir.

Q. You were telling her we can't take him to the doctor. (Lawrence)

A. We tried to convince ourself that he'd get better.

Q. You were telling her we can't take him to the doctor, they'll lock me up. . . . (Lawrence)

Q. Right?

A. I don't remember if I said that or not sir. I know I talked to her about it.

Q. You were more worried about your butt going to jail than you was your child surviving. Save my ass? (Lawrence)

A. I was worried about going to jail sir but I honestly didn't think it would come to this. I didn't think.

We agree that reference to the "physical abuse charge" in Illinois could, and perhaps should, have been avoided. Use of the second excerpt would have presented a lesser risk of prejudice. The rules generally disallow reference to other "charges," whether credible or not. In our view, however, the use of the first excerpt rather than the second did not, standing alone, affect the results of this trial. While mere charges or prior arrests should be avoided, this evidence was particularly probative. Any reason the defendant gave authorities for failing to either feed the victim or provide medical care was

4. This indicates that the question was asked by Detective Johnny Lawrence. Otherwise, the questions were asked by Detective Tim Mason.

admissible to show his actions were knowing or intentional. Moreover, the trial court did provide limiting instructions directing the jury that the "Illinois [trouble] ha[d] no bearing on anything."

 The admission of other portions of the statement that the defendant sought to have redacted are of more serious concern:

Q. You know those are *gay bars?*

A. Yeah.

Q. Why would you go there?

A. Felt more comfortable cause I know when I used to go to bars they ... regular ones people harass you and ... at these places they don't mess with you. You know what I mean? They don't ...

Q. Are you *bi-sexual?*

A. No.

\* \* \*

Q. That's all?

A. Uh talk to women.

Q. You'd *pick women up in these bars* wouldn't you?

A. Uh sometimes basically ... mostly I just ... kiss em ...

Q. You'd take em outside to the car.

A. There was one that I went out with to the car. Just one.

Q. You'd do all of this in front of your wife.

A. No, she didn't know it was happening. She came out ... a security officer in there said that they were going to do more than kiss and that['s when she came out and looked. *That's when the cops came and I was arrested* which was probably maybe 2 or 3 weeks ago ... something like that.

Q. What were you doing when the cops arrested you?

A. I was sitting in the car and uh ... *the other girl was giving me head.*

Q. Ok. Also picked up some men, right?

A. Once.

Q. You took him back to your apartment?

A. Uh huh. Just one man.

Q. One man? With the kids there?

A. They were back in their bedroom.

Q. And *he had sex with your wife while you watched.*

A. Uh huh.

Q. I'm sorry?

A. Yes sir.

Q. With the kids there.

A. Right.

Q. Where were the kids?

A. They were in their bedroom.

Q. Were they asleep?

A. As far as I know.

Q. What's this man[']s name?

A. I don't even know.

Q. You don't ask names. Not there. I go there once a week ... Don works the door ... you don't ask names ... not there. (Lawrence)

\* \* \*

A. ... Well that[']s ... you know like she knows ... she's been kinda by my side when I've gotten into *some of my problems* lately. I told her you know 3 times she had come and get me out of something ... you know always there. *And then after the one time with the girl in the car ...* and she still showed up on uh that one ... I felt someone different ... changed my feelings toward her when she was still willing to back me even though I had done that.

\* \* \* \* \* \*

Q. How much do you average a month on *nightclubbing and drinking ... and other things ... for your personal gratification?* (Lawrence)

A. Well the other things like I said I don't happen but *once with that girl and her once with that guy.*

(Emphasis added). The defendant made specific objections regarding the admission of this portion of the statement:

(1) to evidence of his and his wife's social life, particularly the reference to "gay bars";

(2) to any reference to prior arrests;

(3) to statements dealing with the defendant's "problems" with his wife or the law; and

(4) to how much money he spent on "nightclubbing" or "personal" matters.

Defense counsel argued at the pretrial hearing that the reference to "gay bars" and what the defendant did at these bars was "absolutely devastating" to his case. The concern was that the defendant could be convicted on prejudicial "character" evidence alone. The defense conceded that the state could properly show that the defendant and his wife were often socializing at "bars" while the children were home alone but argued that the specific references to prior sexual misconduct was inflammatory and had little relevance to the central issues.

The prosecution countered that these statements demonstrated how the defendant and his wife would "think through and plan," i.e., they would leave with the express intent of picking people up for sexual purposes while their child was home starving to death. The prosecution contended that this showed the "complete contempt" the defendant and his wife had for the two children and asserted that the defendant's misconduct related generally to the elements of first degree murder.

The trial court ruled that the evidence could be admitted because it gave "a picture of the whole lifestyle and the whole situation." And, at the conclusion of the trial, the trial court explained to the jury that any DUI arrest or any Illinois charge could not be "considered for the purpose of showing [the defendant's] disposition to commit this crime, only to explain it better." We note, however, that the trial court did not provide any curative or limiting instructions to the jury as to how the defendant's hanging out in "gay bars," "nightclubbing," or sexual encounters with men or women outside of the marriage could be considered during deliberations.[5]

In this appeal, the defense describes this evidence as nothing more than a "character assassination" designed to put the jury into an "irate frenzy" even before the defendant testified. The defense again offered an example of how the same information could

have properly been presented to the jury without getting into the "sordid details" of his conduct:

Q. ... Where were you yesterday?

A. In jail.

Q. Being Friday [on the evening before the discovery of the victim's body]. You were in jail, right? What were you in jail for?

A. DUI.

Q. What time did you get home from jail?

A. Bout 6:30 [P.M.] I believe.

Q. Ok.

A. 6:30—quarter to 7 ... something like that.

Q. You left a short time after that didn't you? Where did you go?

A. To work at Wendy's.

Q. Ok. And what time did you get home?

A. Uhm ... bout 2:30—quarter to 3[A.M.].

 * * * * * *

Q. When did you get arrested? (Lawrence)

A. DUI.

Q. When? (Lawrence)

A. When? It was uh ... I think the night before. I believe it was about 2:30 in the morning.

Q. Was that Friday morning? (Lawrence)

A. Yeah.

Q. Where at? (Lawrence)

A. uh on 8th Avenue.

Q. In the parking lot? (Lawrence)

A. No, it wasn't in the parking lot it was ... I just started driving home and he pulled me over for expired tags or ... and then had me do the alcohol test.

Q. Who was with you? (Lawrence)

A. My wife.

Q. Who else? (Lawrence)

A. That was it.

---

**5.** The only limiting instruction contained in the record is that provided contemporaneously with the defendant's statement. A transcript of the jury charge provided at the end of the trial is not included in the appellate record.

Q. The kids with you? (Lawrence)

A. No.

Q. Any certain place they were staying at? (Lawrence)

A. Pardon me?

Q. Is there any certain place your children were staying at? (Lawrence)

A. No they were at home.

\* \* \* \* \* \*

Q. Is that the first time you ever left those children alone? (Lawrence)

A. No.

Q. Second time? (Lawrence)

A. It was more than that. I can't really say how ...

Q. Ten? (Lawrence)

A. More around that number than just twice.

In our view, much of the relevant, probative evidence could have been admitted without reference, in the words of the defense, to "frequenting gay bars, getting 'head jobs' in parking lots, and watching his wife have sex with another man in their apartment." Through more extensive redaction or consideration of the excerpt offered by the defense, the trial court might have avoided much of the prejudicial material proscribed by the rules of evidence. Certainly this particular proof established the defendant as a truly bad character. But the state may introduce character evidence only when the defendant makes it an issue. *Gray v. State*, 191 Tenn. 526, 235 S.W.2d 20 (1950). Here the defense did not. Most importantly, the evidence of prior misconduct must be disallowed if it merely conforms "with a character trait" of the defendant. Tenn.R.Evid. 404(b)(2). Recently, our supreme court spoke on the dangers of prior, sex-related, bad acts in the context of a child victim. This passage perhaps illustrates the reason for the rule:

The general rule excluding evidence of other crimes is based on the recognition that *such evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime* regardless of the strength of the evidence concerning the offense on trial. Such a

potential particularity exists when the conduct or acts are similar to the crimes on trial.

\* \* \*

... [I]t *is clear that the victim's testimony about other uncharged sex crimes was error. ... Moreover, the prejudice resulting from [the testimony of sex crimes] outweighs its probative value. ...*

*State v. Rickman*, 876 S.W.2d 824, 828, and 830 (Tenn.1994) (emphasis added) (citations omitted).

Several years ago, the Georgia Supreme Court reversed a conviction and awarded a new trial for a mother who had allowed her child to starve to death:

The evidence in special ground 1 was that the accused remained out late at night with various men, did not do any work of any kind, entertained various men at her house, operated a disorderly house, and returned home many times late at night, after being out with various men, in various stages of undress; all of which the State alleges was necessary to show a motive that the accused cared nothing for her child, and wilfully and criminally neglected it, which resulted in its death from malnutrition.

*Anderson v. State*, 206 Ga. 527, 57 S.E.2d 563 (1950) (Syllabus Opinion). The court ruled that the character of the defendant was not at issue. It held that the sexual misconduct of the defendant did not show a motive, plan, or scheme to starve the victim and otherwise did not fit within an exception to the general rule of exclusion. The court acknowledged the inflammatory nature of the evidence and emphasized as essential to a fair trial a jury free from the "passion or prejudice" occasioned by the poor character of the defendant. *Id.*

The holdings in *Rickman* and *Anderson* suggest that the admission of this type of evidence almost always affects the results of a trial. That would appear to be particularly so when, as here, the state offers the evidence as the cornerstone of its prosecution. In *Getz v. State*, 538 A.2d 726 (Del.1988), a case cited by our supreme Court in *Rickman*, the Delaware Supreme Court made

further comment upon the rationale behind the rule:

"We are no more inclined to endorse [the assumption that a defendant's propensity for satisfying sexual needs is so unique that it is relevant to his guilt] than we are to consider previous crimes of theft as demonstrating a larcenous disposition and thus admissible to show proof of intent to commit theft on a given occasion."

*Rickman,* 876 S.W.2d at 829 (quoting *Getz,* 538 A.2d at 734).

Having recited the application of these various authorities, we are constrained to hold that the trial court erred by allowing the admission of portions of the defendant's second statement. To describe the defendant's "lifestyle" as unwholesome to family life would be excessively charitable. But lifestyle evidence is character evidence and, unfortunately, examples of prior sexual misconduct on the part of the defendant infiltrated this trial. Thus, a new trial must be ordered.

■ Traditionally, courts have not permitted the state to establish through acts of prior misconduct any generalized propensity on the part of a defendant to commit crimes. *See, e.g., State v. Teague,* 645 S.W.2d 392 (Tenn.1983). A jury cannot be allowed to convict a defendant for bad character or any particular "disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." *Rickman,* 876 S.W.2d at 828 (citing *Anderson v. State,* 165 Tenn. 569, 56 S.W.2d 731 (1933)).

In *State v. Miller,* 674 S.W.2d 279, 284 (Tenn.1984), our supreme court made the following observation:

Ordinarily mere arrests or indictments are not evidence of the commission of a prior crime. They are nothing more than charges or accusations made by the arresting or indicting authority upon such information as that authority had at the time. They should, in our opinion, generally be held inadmissible, unless the accused makes them admissible for impeachment in some manner, such as his testifying that he had never been arrested or indicted. There may [however] be other instances in which they could become relevant and admissible upon some specific issue. . . .

(Footnote omitted). There has been little change in the law over the years:

The general rule has been well established that on prosecution for a particular crime evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial . . . is irrelevant and inadmissible. . . .

*Mays v. State,* 145 Tenn. 118, 140, 238 S.W. 1096, 1102 (1921); *see State v. Hallock,* 875 S.W.2d 285, 290 (Tenn.Crim.App.1993). Further, a statement that the defendant had "several run-ins with the law" was held erroneous (but harmless) in *State v. Johnny Moffitt,* No. 7, 1990 WL 192010 (Tenn.Crim.App., at Jackson, December 5, 1990), *perm. to appeal denied,* (Tenn.1991).

■ With this said, we add that the defendant also sought to have other references to his prior arrests and his "problems with the law" redacted from the second statement. The state argued that this part of the statement was admissible to show the conspiracy between the defendant and his wife as it related to the victim's state of health and their agreement to keep secret his medical condition. The trial court agreed to certain deletions including the reference to "with the law" but held that the remainder of the statement about the defendant and his wife was admissible. References to arrests were permitted as evidence; there were contemporaneous limiting instructions, as previously indicated. In our estimation, the general references to the prior arrests and "problems with the law" should have been redacted although inclusion of the DUI arrest the day before the body was discovered was unavoidably admissible. Yet, standing alone, the effect of any error of these "arrests" might have been harmless in some of their contexts—especially in view of the instructions made to the jury.

And finally, the last portion of the statement that the defendant asked to be omitted referred to how much money a month he spent on "nightclubbing" and other means of "personal gratification." The defendant argued that this was related to the "gay bar"

and sexual gratification evidence which the trial court had already admitted. The trial court excluded references to events in Illinois which took place before the victim's birth as having no relevance. The remainder of the objectionable material was held admissible, however, without further explanation. In our assessment, there would have been no error in showing that the defendant had the means to fulfill his duty to provide food for the infant victim. That is probative and any error might have been harmless. In the context of "gay bars" and "head jobs", however, the danger of prejudice increased immeasurably. Particular care must be exercised in the admission of the evidence on the retrial of this case.

### Conclusion

We readily acknowledge that the issues in this case placed incredible demands upon the skills of the trial judge. The effort to ensure a fair trial is apparent from this record—and commendable. Unfortunately, we cannot characterize the admission of the objectionable portions of the second statement as harmless. Although the trial court did redact parts of the statements, more, in our view, should have been excluded as a guard against the natural prejudice which would result from these revelations. The state placed considerable emphasis on the prejudicial testimony—describing the evidence ₁as the "centerpiece" of their case. Moreover, the state, understandably incensed by these circumstances, made repeated references to bars, drinking, illicit sexual conduct, and the defendant's prior arrests. For example, the social counselor was asked on direct examination if, during her inquiries, the defendant told her he had gone to "bars trying to pick people up," been "drinking," brought strangers to his home "to have sex with them," and was "arrested and spent some time in jail." By all legal precedent known to us, the degree of this error warrants a new trial.

If it was the aim of the prosecution to establish the defendant as a bad character of the first order, it achieved unprecedented success. The facts admitted at trial clearly establish the defendant and his wife as remarkably callous to human suffering. Little positive can be said of anyone, parent or otherwise, who stood idly by while an infant child slowly but surely starved to death. That culpable inattention, however, rather than the inflammatory, extraordinary sexual exploits of the defendant should be the focus of the retrial.

Now, having coldly analyzed the legal issues brought to bear, we choose to comment upon the heart-wrenching nature of the proof at this trial. As human beings, we are horrified that Michael Bordis, Jr., after only three months of life, could starve to death in the crib of his parents' home in Nashville, Tennessee. And, we anticipate general public displeasure with our decision to reverse this conviction and remand for a new trial. Yet the Code of Judicial Conduct requires that judges divorce themselves from their own feelings and render decisions based upon their perception of the law and "unswayed by partisan interests, public clamor, or fear of criticism." Rule 10, Canon 3, Rules of the Supreme Court. In circumstances such as these, that is exceedingly difficult. Our duty to be "faithful to the law," and that alone, compels us to reverse the conviction for first degree murder and remand for a new trial consistent with this opinion.

JONES, J., and ALLEN R. CORNELIUS, Jr., Special Judge, concur.