# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs November 7, 2001

## STATE OF TENNESSEE v. ROGER R. CARTER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-10940      Bernie Weinman, Judge**

---

**No. W2001-00135-CCA-R3-CD - Filed December 18, 2001**

---

The defendant was convicted of the premeditated first degree murder of his wife and sentenced to life imprisonment without the possibility of parole. In this appeal the defendant contends the evidence was insufficient to sustain his conviction. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

A. C. Wharton, Jr., Public Defender; and Michael J. Johnson (at trial), Gregory T. Carman (at trial), and Garland Erguden (on appeal), Assistant Public Defenders, for the appellant, Roger R. Carter.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and James M. Lammey, Jr. and David N. Pritchard, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant and victim were married for approximately two years, separated, and reconciled approximately two weeks prior to the victim's death. During their separation, the victim filed for divorce, and the divorce would have been final five days after her death. The victim's father, Sammy England, testified the victim reconciled to give the defendant one "last chance" to hold a steady job and stay off drugs.

Jackie Wilson, the victim's supervisor at Terminix, testified she last saw the victim on May 7, 1999, at approximately 5:30 p.m. The victim told Wilson the defendant was at work, and she was waiting for him to call so she could pick him up. Wilson further testified the victim helped the defendant obtain a job at a branch location of Terminix, and the victim said she would leave him if he lost it.

Janice Fields, a pre-employment administrator for Terminix, testified that when the defendant applied for a job, he was tested for drugs. The defendant was informed on May 6, 1999, that he failed the drug test. Fields stated the defendant's test indicated the presence of a high level of cocaine.

Tim Clay was employed in May 1999 as a maintenance supervisor at the apartment complex where the defendant and the victim resided. Clay was called to the leasing office, where he was told the defendant's brother, also present, received a call from the defendant stating he had killed his wife and was going to kill himself. Clay obtained a key and went to the defendant's apartment with the defendant's brother. When they arrived, the door was unlocked and a person was yelling from inside. Clay opened the door, and the defendant stated he was dying.

Clay entered and saw the defendant lying on the bed. The defendant had a severe cut on his left hand, apparently self-inflicted. Clay stated blood was everywhere. After the defendant's brother began to administer aid, Clay noticed a comforter arranged in a pile in the floor. Upon closer examination, Clay saw the hand of the victim's body.

Kenny Keelin, defendant's former employer, testified that when he visited the defendant in jail, the defendant told him about the events surrounding the victim's death. The defendant stated he spent all day drinking and using crack cocaine at the lake; when he came home, he and the victim "got into it;" the victim attacked him with a fire poker; he choked the victim, threw her down on the floor, and left; and when he returned the following morning, he saw she was dead and attempted to kill himself.

Keelin stated he and the defendant "split ways" because the defendant's drug use rendered him a "totally different person" who could not control himself. He described the defendant as a good employee during his first period of employment, but he was undependable during his second period of employment due to drug use.

Officer James Max responded to the scene. He stated the defendant had a severe laceration to his hand, but noticed no other injuries. The defendant confessed he choked the victim, but stated he did so only after she attacked him with a fire poker.

Candi Bomprezzi testified the victim worked for her at Saturn of Germantown from May 1996 through December 1998. She described an incident that occurred in August 1998, when the victim and the defendant were arguing on the office phone so loudly she instructed the victim to cease their communication and call him from her car phone. She then granted the victim permission to go to her home to retrieve personal items so she could spend the night elsewhere. The victim called her approximately 45 minutes later, crying, and stated the defendant choked and hit her. When the victim returned to work, she observed marks on the victim's neck and bruises on her chest.

Dr. O'Brian C. Smith performed the autopsy on the victim. Dr. Smith stated the victim had a rope ligature knotted on her right wrist that had "gone up across the front of the neck and . . . had marks of being looped around the left wrist . . . ." There were also pressure marks on her wrists from

the rope. On the victim's head, there were two deep contusions consistent with being thrown against a wall, evidenced by a photograph of broken drywall depicting an embedded light brown hair. Dr. Smith further stated the victim had hemorrhages in her eyes, denoting she was alive prior to strangulation; it took approximately two minutes of sustained strangulation to produce unconsciousness and an additional four minutes of sustained strangulation to produce death; and strangulation likely occurred from a "sustained force" and not a single impact, as evidenced by bruising and bite marks on the victim's tongue and the markings on her neck. On cross-examination, Dr. Smith conceded it was possible the victim's strangulation occurred due to a single impact.

The defense offered testimony from Joseph Ozment and the defendant.

Joseph Ozment, an attorney who initially represented the defendant, testified he met with the defendant in the hospital. Ozment further stated the defendant indicated he suffered from bumps, bruises, and an injury to his hand. Ozment recalled seeing the injury to his hand, not the self-inflicted injury, and felt it had been "completely ignored" by hospital personnel. Ozment stated hospital staff denied him permission to photograph the defendant's injuries.

The defendant testified at trial. He stated the first few years of his relationship with the victim were "great," although they both had bad tempers which caused physical altercations. He stated that when they first married, he only used alcohol and marijuana. The defendant's drug use progressed to crack cocaine. He stated he was hired by ServiceMaster, a subsidiary of Terminix, conditional on his passing a drug test. On May 6th, he and the victim learned he failed the drug test, causing the victim to become angry.

Defendant testified that on May 7th, he and a friend planned to spend the day on the river. That morning, the defendant rode with his friend to buy beer, and the friend agreed to stop at a house so the defendant could purchase crack cocaine. The defendant purchased the crack and returned to his apartment while his friend "t[ook] care of some business." He stated that while he waited in his apartment, he smoked approximately five rocks of crack cocaine. His friend then returned, and the defendant smoked more crack before they left. They drove to a store where the defendant purchased beer, and the defendant drank beer and smoked additional crack while they drove to the river. Once in the boat, the defendant drank beer and smoked marijuana. The victim called the defendant on his cellular telephone numerous times instructing him to return home. At approximately 8:30 p.m., they started home. While returning home, they stopped at the crack house again; the defendant purchased two or three additional rocks of cocaine; and he smoked them on the way home.

Defendant testified that when he arrived home, he and the victim argued until the victim struck him on his hand and head with a pipe or fire poker. At that point, the defendant said he took the object from her and choked her with it for a matter of "seconds;" they fell against the wall and onto the floor; and he took rope and looped it around her hands. According to the defendant, he then left the residence, withdrew money from an ATM, purchased additional crack, and drove around all night smoking it. He said when he returned to the apartment the next morning, he saw that the victim was dead. He then placed a comforter around her, got a knife, cut his wrist, and called his brother. The defendant stated he did not plan to kill the victim.

On cross-examination, the defendant stated he did not recall choking the victim in August 1998, but it "may have happened." He further stated he did not recall the victim struggling as he bound her, knotting a rope to restrain her, nor replacing the fire poker in the stand. The defendant explained he was unsure whether the object with which she attacked him was a fire poker or a pipe. He was, however, certain he did not choke her the length of time Dr. Smith opined was necessary to cause death.

For rebuttal proof, the state offered the testimony of Sherry Colley, the records-keeper of Union Planters Bank, and Beverly Wilson, the records-keeper of the Regional Medical Center. Colley testified two ATM withdrawals occurred from the victim's individual account on May 7, 1999, at 11:30 p.m. and 11:31 p.m. for $80 and $100, respectively. Colley further stated there were two unsuccessful ATM withdrawal attempts on May 8, 1999, at 6:30 a.m. and 6:31 a.m. Beverly Wilson testified the defendant's medical records indicated his only injury was the self-inflicted cut to his left wrist.

The jury convicted the defendant of premeditated first degree murder, rejecting self-defense and intoxication as defenses to the charge.

## SUFFICIENCY OF THE EVIDENCE

The defendant contends the evidence was insufficient to sustain a conviction for premeditated first degree murder. We respectfully disagree.

### A. Standard of Review

When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. State v. Brewer, 932 S.W.2d 1,18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. Id. In State v. Grace, the Tennessee Supreme Court stated, "[a] guilty verdict by the jury, approved

by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973).

## B.  Premeditated Murder

The applicable definition of first degree murder is, "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1).  Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992), and "an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself," Tenn. Code Ann. § 39-13-202(d).  It also requires that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

The element of premeditation is a question of fact to be determined by the jury.  State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000).  Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing.  State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

## C.  Analysis

We must view the evidence in a light most favorable to the state.  Although the defendant testified he did not intend to kill the victim, the circumstances surrounding the killing allowed the jury to conclude otherwise.  During the altercation, the victim was beaten, and her head struck the wall with such force that the drywall fractured.  The defendant bound the victim's hands with rope prior to choking her; the defendant choked her for approximately two minutes until she lost consciousness; and the defendant continued choking her for an additional four minutes until she expired.  The trial court instructed the jury regarding intoxication as a defense as well as self-defense.  The jury, as was its prerogative, rejected these defenses.  *See* State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (noting jury's prerogative to reject self-defense); State v. Brooks, 909 S.W.2d 854, 859 (Tenn. Crim. App. 1995) (noting jury's prerogative to reject the intoxication defense).  The evidence was sufficient to allow the jury to conclude the defendant, with premeditation, intentionally killed the victim.  This issue is without merit.

**CONCLUSION**

Based on our review of the record, we affirm the judgment of the trial court.

_____
JOE G. RILEY, JUDGE