# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 2, 2009 Session

## STATE OF TENNESSEE v. MARTINO KELLEY

**Direct Appeal from the Criminal Court for Shelby County**
No. 07-07974     W. Mark Ward, Judge

**No. W2008-01851-CCA-R3-CD  - Filed December 1, 2009**

The defendant, Martino Kelley, was convicted of the first degree (premeditated) murder of his wife and sentenced to life without the possibility of parole.  On appeal, he argues that: (1) the evidence was insufficient to support his conviction; (2) the State's attorney committed reversible error in referencing the jury's responsibility to the community; and (3) the trial court abused its discretion in denying the defendant's motion to continue the trial.  After careful review, we affirm the judgment from the trial court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Gerald S. Green, Memphis, Tennessee, for the appellant, Martino Kelley.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case involves the murder of the victim, Lakessia Kelley, by her estranged husband, the defendant.  The victim had initiated divorce proceedings but, while attempting to reconcile in May of 2007, the defendant shot the victim in the marital home in Shelby County.  The victim was shot at least five times and sustained wounds to her forehead, her left breast, the back of her neck, her upper back, and her left arm.  The victim was twenty-six years old at the time of her murder, and the defendant was twenty-nine years old.

At trial, the defendant's nine-year-old son testified that he remembered May 12, 2007, as the day his father killed the victim.  He was in an upstairs room at the defendant's house just across the hall from the room where the defendant killed the victim.  He heard three gunshots and ran

downstairs to tell his siblings. He told the defendant to "quit" but heard more gunshots and heard the victim say, "get off of me or I'll call the police." The defendant told her that he did not care and that he had been to jail once. The defendant locked the door to keep his son out of the room with the victim. The police arrived later and took him and his siblings from the home.

A Tennessee Army National Guard recruiter testified that he met the victim after her brother enlisted in the Army. He recalled receiving several phone calls the day before the murder from someone who identified himself as "Terrance." The caller stated that he had found the recruiter's number in the victim's cellular telephone and was inquiring about the nature of his relationship with the victim. The caller also told the recruiter that he was the victim's "man." The victim had previously told the recruiter that she had problems with the defendant and wanted to take out a restraining order against him. Additionally, the recruiter had previously had an incident with the defendant where the defendant shoved him and accused him of sleeping with his wife.

The recruiter denied that he tried to seduce the victim and denied that he had dated her. He said that he had spoken with both the victim and the defendant on the day of her murder. He recalled the defendant told him, "I love my wife but if she don't want to be with me that's fine." The recruiter was in Arkansas and said he could not get to the victim but told her on the telephone that everything would be okay.

A suitor of the victim testified that he was dating the victim when she was murdered. He testified that they had discussed marriage but that she was in the process of divorcing the defendant. He testified that he called the recruiter when he learned that the recruiter was calling the victim. The victim advised him that the recruiter was a friend. He also spoke to the victim the day before she was killed, and he heard the defendant "hollering" in the background. He denied any involvement in the victim's death.

Officer Newt Morgan with the Memphis Police Department testified that he investigated the scene where the victim was murdered. The victim was shot several times in the upstairs master bedroom. The murder weapon was found approximately five feet from the bedroom door. The deceased victim was lying on the floor near the side of the bed.

Officer James Harden with the Memphis Police Department testified that he responded to a call at the defendant's house between 8:00 a.m. and 8:30 a.m. He was told by dispatch that the defendant had telephoned and reported that he had killed his wife. Two officers were already at the scene when he arrived. The defendant was at the top of the stairs outside the house holding a gun with his three children as hostages. The officers were able to get the children out of the home, but the children did not want to pass the door where the defendant stood. There was a standoff with the defendant after the children were removed from the home. The defendant told the officers that he was sorry that he killed the victim and did not think he should live. A sheriff's deputy found the victim's body in an upstairs bedroom and secured the scene for crime scene investigators.

A member of the Memphis Police Department crisis intervention team testified that he responded to the defendant's home during the standoff to assist the defendant who was threatening suicide. The defendant told him that he had killed his wife. The officer testified that he transported

the defendant to the homicide division and advised the defendant to wait to say anything until he could speak with homicide detectives. The defendant talked throughout their drive. He said he was sorry for what he had done and was concerned about the welfare of his children.

David Parks, a homicide investigator with the Memphis Police Department, testified that he responded to the scene on the day of the murder and searched the defendant's residence after obtaining a search warrant. He observed the victim and her gunshot wounds. He obtained a recording of the 9-1-1 call where the defendant identified himself twice and said that he shot and killed the victim.

William Ashton, a homicide investigator with the Memphis Police Department, testified that he was in the homicide office when the defendant was brought into the department. The defendant was placed in an interview room and was shackled to a metal bench. He could hear the defendant's leg shackle rattling against the metal bench. He checked on the defendant and found that he had fashioned the drawstring of his pants into a noose and attached it to a bulletin board. He took the noose from the defendant. He then observed the defendant from the one-way mirror and saw him attempt to manually strangle himself. He continued to monitor the defendant until he eventually put his head on the desk and went to sleep.

A sergeant with the Memphis Police Department testified that he participated in an interview with the defendant. The defendant initially requested an attorney but later advised that he wanted to answer their questions. The defendant did not draft a formal statement but told officers that he and the victim were married but had separated after he had an affair that produced a child. He and the victim decided to reconcile a few days prior to the murder, and the victim and their children moved in with him. The defendant said that he had "sexual relations" with the victim the night before the murder and the morning of the murder, but the victim began to change her mind about a reconciliation. He got his pistol and told his children to stay downstairs and that he loved them. He went back upstairs and saw the victim sitting in a chair. The defendant said that the next thing he remembered was seeing her fall to the floor. He did not know how many shots he fired, but he did recall that he phoned police.

A Shelby County medical examiner testified that he performed the autopsy on the victim on March 12, 2007. She died as a result of gunshot wounds to her head and torso. He observed that she was shot "at least five times" including shots to her forehead, left breast, back of her neck, upper back, and left arm. He opined that the shots to her back could have been fired as she lay on the floor.

The defendant made an offer of proof during a jury-out hearing. He called Debbie Nichols, the forensic coordinator at Midtown Mental Health Center, to testify that he suffered from diminished capacity. Following her testimony, he withdrew his offer of proof because she opined that he was competent to confer with an attorney to assist in his defense and was competent to stand trial.

The defendant testified that he and the victim were married for seven years. They separated on September 19, 2006, because he had an affair that produced a baby. The victim had primary custody of their children. The defendant said he regularly saw the victim and his children despite

their separation. He learned in March 2007 that the victim filed for divorce. In April 2007, he said they began to see each other more until the defendant told the victim that he might move to pursue a business opportunity. He said the victim asked him to take her back.

In May 2007, the victim was evicted from her home and moved in with the defendant. The defendant testified that he received a telephone call from a man regarding his romantic relationship with the victim. The defendant said that he and the victim discussed it and moved forward by spending the evening eating pizza and having an "uneventful" night.

The morning of the victim's murder, the defendant received a telephone call from a woman he dated previously. The victim made the comment that the call must have been from one of the defendant's "bitches." The defendant answered the call and told the woman that he had reconciled with his wife. The defendant then told the victim that she needed to tell her friends they were back together. He testified that she called the recruiter and that, afterward, they were "intimate." After their intimacy, they discussed some "unpleasant things," including the defendant's affair that caused their initial separation. They both received additional telephone calls, which caused tensions to escalate.

The defendant contended that he did not contemplate killing the victim because he loved her. He recalled that, immediately before he shot her, the victim took another telephone call, which made him angry. He testified that the gun was in the bedside table and that the victim was seated in a chair across the room. He said he realized what he had done when he saw the victim fall to the floor after the third shot. When the police arrived, he threatened to kill himself but said he had no intention of actually killing himself even though he left a note that said, "she made me . . . I did [it] out of love."

The defendant was aware that the victim had filed for an order of protection against him around the time of their separation. They went to court on the order in December 2006. He admitted that he had previously assaulted the victim, but she did not file charges against him. He denied ever assaulting their children and denied causing the victim to lose her job by harassing her at work. When asked whose was at fault for the shooting, he responded, "I'll have to take responsibility."

The defendant was convicted of first degree (premeditated) murder and sentenced to life without the possibility of parole.

Analysis

On appeal, the defendant argues that the evidence was insufficient to support his conviction for first degree (premeditated) murder. In his brief, the defendant merely concludes that the trial court erred in denying his motion for acquittal because the State did not show that he was "sufficiently free from passion to form the required mental state to commit Murder in the First Degree." The defendant's brief consists of conclusions as introductions to the issues that he raised and the text of his argument contains boilerplate language that includes the statutory definitions for

-4-

the homicide offenses. He makes no attempt to apply the law to the facts of his case. Further, in the argument of his brief, the defendant failed to cite to the record. Therefore, this issue would be properly waived. *See* Tenn. Ct. Crim. App. R. 10(b); *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997); *State v. Turner*, 919 S.W.2d 346, 358 (Tenn. Crim. App. 1995); *see also* Tenn. R. App. P. 27(a)(7) and (g). However, we will not deny the defendant his opportunity on appeal because his counsel on appeal failed to comply with the Rules of Appellate Procedure.

Regardless, the evidence presented at trial is sufficient to support the defendant's conviction. A defendant challenging the sufficiency of the proof has the burden of illustrating why the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). We review the evidence in the light most favorable to the prosecution to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). We do not reweigh or reevaluate the evidence but afford the State the strongest legitimate view of the proof contained in the record, as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

Evaluation of witnesses' credibility, the weight and value to be given to the evidence, and resolution of factual issues raised by the evidence is left to the trier of fact. *Id.* at 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the State's witnesses, and a presumption of guilt replaces the presumption of innocence. *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).

When viewed in the light most favorable to the prosecution, any rational trier of fact could have concluded that the defendant committed first degree (premeditated) murder. First degree murder is the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006). Here, it is undisputed that the defendant shot and killed the victim. The defendant denies that he intentionally shot the victim, but the evidence established that the defendant was angry that the victim had been dating other men during their separation. By his own admission, he was angered that she accepted a telephone call just before he shot her.

The element of premeditation is a question of fact to be determined by the jury. *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our supreme court delineated several circumstances that may be indicative of premeditation, including declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

The element of premeditation is present in the instant case. The defendant acknowledged a history of physical abuse toward the victim. The recruiter had a physical confrontation with the

defendant. The defendant's son testified that he pleaded with the defendant to stop hurting the victim after the initial shots were fired, but the defendant continued to shoot her. There was testimony elicited at trial that some of the victim's multiple gunshot wounds could have been sustained as she lay on the floor. The defendant admitted in a statement that he went downstairs and told the kids he loved them before he murdered the victim. Based on the evidence presented at trial, a rational jury could have concluded that the defendant was guilty of first degree (premeditated) murder. This issue is without merit.

Next, the defendant argues that the State committed reversible error when the State's attorney made a passing reference during closing argument to the jury's responsibility to the community. Again, the defendant fails to make any citation to the record to support his argument. His brief consists of a statement in introduction that the State's attorney made a statement that the jury needed to send a message to the community and, thereby, made the panel feel they had a duty to the community to return a guilty verdict. His argument consists of stating the factors used to determine if prosecutorial misconduct has occurred as set forth by the Tennessee Appellate Courts.

The defendant does not reference the record for this issue, which causes this court to speculate as to the specific language he contests. Under these circumstances, it is not the obligation of an appellate court to review this issue as it is presented. The defendant is required on appeal to make appropriate references to the record in the argument portion of his brief and to cite relevant authority. This issue is waived since the defendant fails to make appropriate references to the record. *See* Tenn. Ct. Crim. App. R. 10(b); *Schaller*, 975 S.W.2d at 318; *Turner*, 919 S.W.2d at 358; *see also* Tenn. R. App. P. 27(a)(7) and (g).

Next, the defendant argues that the trial court erred when it denied his motion for a continuance. Specifically, he contends that being in jail affected his state of mind so that he was not able to assist in his defense. However, this issue is waived as the defendant fails to cite authority to support his argument. *See* Tenn. Ct. Crim. App. R. 10(b); *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997).

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment from the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE