# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 6, 2003

## STATE OF TENNESSEE v. MARK PERRY

### Direct Appeal from the Criminal Court for Shelby County
#### No. 01-04249     Joseph B. Dailey, Judge

---

### No. W2002-01266-CCA-R3-CD  - Filed June 4, 2003

---

The defendant appeals the jury's verdict convicting him of premeditated first degree murder for which he received a life sentence. He contends there was insufficient evidence to establish he acted with premeditation. We affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Robert Wilson Jones, Public Defender; and Dianne M. Thackery (at trial) and Tony N. Brayton (on appeal), Assistant Public Defenders, for the appellant, Mark Perry.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; William L. Gibbons, District Attorney General; and Stephen P. Jones and Jennifer S. Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The defendant, Mark Perry, confessed to killing the victim, Clint Finley, by striking him in the head with an axe. In his confession, the defendant maintained the killing was the result of a violent argument in which the victim attempted to attack him with a knife and then the axe. A Shelby County jury convicted the defendant of premeditated first degree murder. He was sentenced to life with the possibility of parole. In this appeal, the defendant argues there was insufficient evidence to establish he acted with premeditation. Based upon our examination of the record, we conclude otherwise.

### FACTS

The proof at trial established that Maxine Wooten and her husband, Larry Wooten, provided care for the sixty-one-year-old victim, whom witnesses described as "handicapped." The victim occupied a small outbuilding located next to a tool shed behind the Wootens' home. The defendant,

an acquaintance of the Wootens, often spent time with the victim and would sometimes sleep in the tool shed.

Mrs. Wooten testified that on Friday, September 1, 2000, she gave the victim $100 in cash, which she placed in his wallet and pocket as she had done each month when the victim received his monthly check. According to Mrs. Wooten, the victim put his money in his pillow when he slept. She also testified the victim had a watch and a locket.

Mrs. Wooten stated she served the victim his supper at about 8:00 p.m. She said that at approximately 10:00 p.m., she observed the victim "peek out" of the outbuilding as he prepared to watch television and go to sleep. The Wootens testified they left to go to a casino at approximately midnight, and the victim was missing when they returned the following morning. Mr. Wooten stated he noticed two tree branches had been cut from above the outbuilding. The Wootens said they searched unsuccessfully for the victim.

On Sunday, September 3rd, Mrs. Wooten filed a missing person report. On the same day, Mr. Wooten found the defendant sitting in the victim's chair in the outbuilding. Mr. Wooten testified the defendant told him he had not seen the victim. Mr. Wooten also testified that later in the evening, he heard loud music coming from the backyard and observed the defendant cleaning the outbuilding. He stated the defendant removed the furniture from the building, hung the rug over the fence, and sprayed the rug with water.

On September 5th, police responded to a call from a neighbor who noticed a strong odor coming from a ditch. They discovered the victim's body and a bag of clothes wrapped in sheets, a quilt, and a blue tarpaulin lying in the ditch covered by sawed branches.

On September 7th, the defendant agreed to an interview with police officers. At first, the defendant denied any knowledge of the murder. He told officers he saw the victim in his bed on Saturday morning. He said when he returned to the outbuilding several days later, he left after he noticed blood and a hole in the mattress. He eventually gave officers a statement in which he implicated himself. He said that on the night of the offense, he played cards with Mrs. Wooten, and then went to the store. He indicated he and the victim began drinking around 9:30 p.m., and they consumed a total of eighteen twelve-ounce cans of beer and two forty-ounce bottles of Colt 45 malt liquor. According to the defendant, he and the victim argued because the victim would not allow him to watch television in his outbuilding. The defendant said that after he exited the building and slammed the door, the victim came outside with a knife. The defendant then stated:

> After he started swinging at me with the knife, I kicked it out of his hand and he ran behind the tool shed and picked up an axe and began to swing at me with it and upon one of his swings, it went into the ground and I got the opportunity to get possession of the axe and it just happened so fast, I swung it and hit him with it and I was just scared, I tried to takin (sic) him back in the room and put him in his bed, but there was so much blood that I tried to hide the body and I wrapped him up in his sheets and a blue tarp. There was so much blood in my hand I slung it up on some clothes that were hanging on the wall. I tried to clean up the mess. I threw the clothes in the

ditch. I pulled the body and the clothes to the site and just rolled him over into the ditch.

The defendant stated that he struck the victim "just once" with the axe. He admitted painting the axe with silver paint after he tried to clean it. He said he did not know what happened to the victim's money and jewelry. Sgt. Robert Shemwell testified the defendant asked him, "Does this look like self-defense to you?"

Homicide investigators testified they observed what appeared to be blood splatters on the walls surrounding the victim's bed in the outbuilding. They also discovered a small stain on top of the victim's mattress. Upon lifting the mattress, they observed a large blood stain on the bottom of the mattress, which had been smeared with gel toothpaste.[1] Sgt. Donald Wright stated he found a rug hanging on the Wooten's fence and the victim's chair sitting across the street from the Wootens' home. Officer Sherman Bonds testified a pillow and sheet apparently stained with blood were found inside the blue tarpaulin that covered the victim's body. Neither the victim's money nor jewelry was recovered.

Mrs. Wooten testified that the victim walked with "a rock and a limp" and did not have full use of one of his arms. She indicated that his fingers were drawn, and he held his hand at his waist. According to her, the victim "couldn't run like the average person" and would not have been able to swing the axe. Mr. Wooten also testified that the victim would not have been able to swing the axe or run.

Medical examiner Dr. O. C. Smith testified that the soles of the white socks on the victim's feet did not appear to be dirty from walking on dirt or grass. Dr. Smith stated that blood alcohol tests revealed the victim had a blood alcohol level of .03 grams per decaliter, which indicated he was not under the influence. Dr. Smith indicated he would have expected the victim to have a considerably higher blood alcohol level if he had consumed the amount of alcohol alleged by the defendant in his statement to law enforcement. Dr. Smith also testified that the victim died of trauma to the head; he opined that anything near the victim's head at the time of the trauma would have been stained by blood.

Forensic anthropologist Dr. Steven Symes, who inspected the crime scene along with other members of the medical examiner's office, testified they were unable to find any blood outside of the outbuilding. He stated he found there was "medium velocity splatter" on the wall near the victim's bed. Dr. Symes further testified that the right side of the victim's skull was fractured by a single, sharp blow, or chop. He opined that an axe found leaning against the Wootens' tool shed could have caused the injury. He also stated that the victim's left cheek and jaw were fractured as a result of blunt trauma; he opined this trauma could have been the result of a separate blow or, if the victim's head were upon another object, the injuries could have been caused by a single blow.

---

[1]Although it is not entirely clear from the record, it would appear the state's theory was that the defendant attempted to conceal the large blood stain by applying gel toothpaste and flipping the mattress.

## SUFFICIENCY OF THE EVIDENCE

The sole issue raised in this appeal is whether there was sufficient evidence to support the jury's finding that the defendant acted with premeditation in killing the victim. When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. State v. Brewer, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## PREMEDITATION

The applicable definition of first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted), and "an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). It also requires that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

The element of premeditation is a question of fact to be determined by the jury. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our supreme court delineated several circumstances that may be indicative of premeditation, including declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

## ANALYSIS

In the instant case, the record reflects the state proffered ample evidence that the defendant acted with calmness shortly after the killing, and that he attempted to destroy and secrete evidence.

-4-

The state established the defendant immediately hid the victim's body. By his own admission, the defendant wrapped the body, along with bloody sheets and clothing, in a blue tarpaulin and dumped it in a ditch. Mr. Wooten testified that when he returned home on the morning following the murder, he noticed branches had been cut from trees in his backyard. The medical examiner testified he observed that the victim's wrapped body was covered by sawed tree branches. Further, the state established that the defendant attempted to sanitize the crime scene. According to Mr. Wooten's testimony, the defendant boldly returned to remove furniture and wash the rug.

The defendant argues that the only proof of the defendant's actions at the time of the murder was contained in the defendant's statement. However, we note that the state presented a host of proof contradicting the facts alleged by the defendant in his statement.

The defendant stated he and the victim had been drinking heavily; yet, the medical examiner testified the victim's blood alcohol level showed he was not under the influence. While the defendant told officers that he and the victim were outside the outbuilding when he struck the victim with the axe, witnesses testified they observed what appeared to be splatters of blood near the victim's bed and a large stain on the victim's mattress. No blood was found outside of the outbuilding, and the victim's white socks were not soiled. Although the defendant said the victim ran, seized the axe, and swung it repeatedly at the defendant, witnesses testified the victim was not physically able to perform such a feat. Thus, the jury could have reasonably inferred that the defendant procured the axe and maliciously struck the unarmed victim in the head. In addition, the defendant said he struck the victim once immediately following a struggle for the weapon, but the testimony of Dr. Symes indicated the defendant either struck the victim more than once or he struck the victim while the victim's head was resting against another object. Neither of these scenarios is consistent with the defendant's version of the events.

Finally, the proof established the victim's money and jewelry were never recovered. The jury could have reasonably inferred from this proof that the defendant took the victim's money and jewelry, which is inconsistent with the defendant's statement to the police.

Given the evidence presented to the jury, we conclude there was sufficient evidence to support its verdict. Accordingly, we affirm the judgment of the trial court.

_____
JOE G. RILEY, JUDGE