IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 6, 2015

**STATE OF TENNESSEE v. COREY ANTUAN GRAY**

**Appeal from the Circuit Court for Madison County**
**No. 14167     Roy B. Morgan, Jr., Judge**

———————————

**No. W2015-00049-CCA-R3-CD  -  Filed November 24, 2015**

———————————

The Defendant, Corey Antuan Gray, was convicted by a Madison County Circuit Court jury of four counts of attempted first degree murder; four counts of aggravated assault; four counts of employing a firearm during the commission of a dangerous felony; and one count of evading arrest. Following a sentencing hearing, the trial court merged the attempted murder and aggravated assault convictions and sentenced the Defendant as a Range I, standard offender to consecutive sentences of twenty years for each count of attempted murder, six years for each count of employing a firearm during a dangerous felony, and one year and six months for evading arrest. On appeal, the Defendant argues that the evidence was insufficient to support all four of the convictions for attempted first degree murder and that his sentence is excessive.[1] Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Joseph T. Howell, Jackson, Tennessee, for the Defendant-Appellant, Corey Antuan Gray.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Jerry Woodall, District Attorney General; and Jody Pickens, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

---

[1] Because the Defendant's sole challenge to the sufficiency of the evidence pertains to the attempted first degree murder convictions, we will limit our summary of the proof at trial to those facts relevant to the attempted first degree murders.

The Defendant was involved in a shooting that took place in November 2013, at 88 Holland Avenue in Jackson, Tennessee. On March 31, 2014, he was indicted on four counts of attempted first degree murder, four counts of aggravated assault, four counts of employing a firearm during the commission of a dangerous felony, and one count of evading arrest. At the November 4, 2014 jury trial, Kimberly Swift Jeter and her husband, Donell L. Jeter, and their sons, Jonathan Swift and Dontavius Jeter, testified consistently that on November 11, 2013, at around 11:00 p.m., shots were fired at their family residence on Holland Avenue while they were inside the home. They all testified that they were not physically injured and did not see who was shooting or observe anyone trying to enter the residence. However, they consistently identified photographs of bullet holes in the house, including one in Jonathan's bedroom window, which did not exist prior to the shooting.

Jonathan Swift, age twenty-two, testified that he was on the floor of his mother's bedroom on the night of the incident when he heard "about six gunshots" and immediately called 9-1-1. He said that he could not tell how close the shots were when they were fired but that he called police because "[his] life was in danger." On cross-examination, he confirmed that he had previously been a member of the Vice Lords street gang but was no longer affiliated with the gang. He further testified that his brother, Joshua Swift, was an active member of the same gang. He agreed that his brother Joshua was not present during the November 11 shooting but stated that he did not know where his brother Joshua was living at the time.

Dontavius Jeter, age seventeen, testified that he lived on Holland Avenue with his parents and two brothers, Jonathan and Joshua. On the night of the shooting, he was asleep in the back of the house until he woke up to the sound of gunshots. He said that he heard about three shots and that the gunfire placed him in fear "[o]f my life, that I could have been shot." He also confirmed that Jonathan was previously involved with the Vice Lords and Joshua was presently involved. Neither he nor his parents were in a gang. He was unaware if the Vice Lords had any ongoing disputes with other gangs. Dontavius testified that his house had been shot at a week before the November 11 shooting and that Joshua had been shot sometime before November 11 as well.

Kimberly Swift Jeter testified that she had lived on Holland Avenue with her husband and three sons in November 2013. She said that on the evening of November 11, she was in her bedroom talking to Jonathan, who was lying on the floor beside her, when shots that "sounded close" were fired from the front of the house. She recalled that Jonathan immediately dialed 9-1-1 while she lied in bed because she was both disabled and scared to move. She said that Dontavius came into her bedroom and she told him to "Get down" and then to "Go check on your daddy." She stated that, at that time, "I was [in] fear [for] anybody in the house." She further claimed that on the night of the

incident, her son Joshua had been at a friend's house but eventually left to go to the emergency room after medical complications arose from his recent gunshot wound. On cross-examination, Kimberly testified that Joshua was shot in the afternoon in Royal Arms, not at the residence on Holland Avenue. She also confirmed that Joshua was a member of the Vice Lords gang and said that Jonathan had been "up until maybe a couple of weeks before" the first shooting. She stated that Joshua often had other Vice Lords at the family residence and described her house as the "hang house." She was unaware if they had any disputes with other gangs in November 2013, but she "knew [Joshua] was in a gang and they had gang fights and hung out at [her] house."

Donell Jeter testified that he lived at 88 Holland Avenue with his wife Kimberly, and three of their five children. He acknowledged that Joshua was in a gang and claimed that Jonathan had been at the time of the shooting but was no longer a member. He said he did not approve of gang membership and that neither he, his wife, nor Dontavius was in a gang. At the time of the shooting, he said he was in the living room watching television when he heard gunfire from the front of the house and quickly got down on the floor because he was concerned about being shot. He recalled that he heard around seven or eight shots and that the shooting lasted around a minute or a minute and a half. He also said that he heard glass break in Jonathan's bedroom from a gunshot and later observed that "[h]is window was broken and it looked like [a] bullet hit the mirror on his dresser." When asked about Joshua's whereabouts that evening, Donell testified that "I think . . . [h]e was released from the hospital, and he went over his cousin['s] house." On cross-examination, regarding the prior week's shooting, Donell testified that Joshua "was shot that day and my house got shot up that night." He claimed that he did not know what street gang Joshua and Jonathan were affiliated with but that it was common for them to bring their gang affiliates and friends to the house at 88 Holland Avenue.

Jackson Police Department patrol officer Buddy Joe Crowell testified that on November 11, 2013, he received a "shots-fired" call at 88 Holland Avenue "stating that the house had been struck and there was a dark colored vehicle leaving the area with approximately five people or so in it." He immediately responded and, on his way to the scene, he saw a vehicle matching the suspect car's description travelling north on Highway 70. He deactivated his patrol car's lights and sirens to avoid detection and reinitiated them once he caught up to the vehicle. He testified, and the patrol car surveillance video confirms, that "[a]t first, the vehicle put on [its] brakes like [it] was going to stop, and then all of [the] sudden[, it] took off at a high rate of speed." The car was travelling 70 miles per hour down Lexington when it lost control and struck a light pole, causing a transformer to blow. The wreck occurred about a mile or a mile and a half from 88 Holland Avenue.

Officer Crowell stated that there were initially five passengers in the suspect vehicle but the impact from the collision threw one passenger, later identified as Keondre Long, from the vehicle. Then, he observed three other male passengers flee the scene, one toward Highway 70 and two down Lexington. He also encountered the vehicle's driver, Shenqua Ross, whose voice was identified on the police surveillance video. He further observed two firearms at the scene, .38 and .40 caliber pistols, which were both within reaching distance of Keondre Long. He photographed and collected various items from the scene that were introduced at trial as evidence, including: an Intratec DC nine-millimeter pistol (Tec-9), a Tec-9 magazine with 22 nine-millimeter shells inside, a .40 caliber Hi-Point pistol loaded with five .40 caliber bullet rounds, a .40 caliber magazine, a .38 caliber Rohm revolver loaded with one .38 caliber shell casing, and four .38 caliber live rounds. On cross-examination, Officer Crowell testified that the weapons recovered from the scene were operable and loaded. He also stated that two of the firearms were semiautomatic weapons and that he considered them all "dangerous weapons."

Shenqua Ross, age twenty-two, the aforementioned driver, testified that she was currently incarcerated for her involvement in the Holland Avenue shooting. She explained that the Defendant, whom she identified at trial as Corey Gray, had been her boyfriend for four months at the time the shooting occurred. She agreed that when she was arrested on November 11, 2013, she gave a statement that was not "the complete truth," but gave a second statement the next day. She confirmed that she had accepted a plea offer in exchange for her truthful testimony and that she had already testified previously against Keondre Long.

Ross stated that on November 11, 2013, at around 10:30 p.m., she was at the store with her two-year-old son when she received a call from the Defendant on a restricted number. At the time, she drove a blue Crown Victoria and the Defendant asked her to pick him up at his grandmother's house on Jackson Street and take him somewhere. When she arrived, she dropped her son off at the house and picked up the Defendant, Hentrick Long, Casey Mackey, and Keondre Long. She noted that Mackey was wearing a red bandanna around his face. The Defendant, sitting in the front passenger seat, directed her to drive to East Chester and then to Holland Avenue. She said that "[a]ll of them" instructed her to park at the church on the corner of Cloverdale and Holland Avenue. She additionally testified that, on the way to the church, the other men put bandannas around their faces, and the Defendant had his gun in his hand. She conceded that she knew "they [were] fixing to do something strange." When she pulled into the church parking lot, the Defendant and other passengers instructed her to "sit and wait" when they got out of the car.

Ross saw that the men were carrying guns, which she identified at trial as belonging to the Defendant and Keondre. She agreed that she also recognized the third

gun. When counsel for the State asked her why she did not leave once the men exited the car, she responded, "Listening to Corey and them." She said that the men went around the church and then she heard several gunshots. She stated that, "[a]fter I heard the gunshots, they came running back around the church and got in my car." The Defendant then instructed her to take them back to his grandmother's house, and she proceeded to the Highway 70 Bypass.

Ross additionally testified that while driving down Highway 70, she saw a police car pull behind her and told the passengers, "[t]he police [are] behind us." The Defendant told her to "Keep going." Eventually, she turned left onto Lexington Street, and she agreed that there were schools and The Boys & Girls Club nearby. Inside the car, she said that the Defendant and other men were talking and that "[t]hey [were] telling me to stop, they [were] going to jump out." She agreed that even though police activated their blue lights, she did not stop. She claimed that she continued driving because "I was told not to stop. I was scared. I did [not] know if I should stop or keep going." She said that she sped up and crashed her car and the other passengers "jumped out and ran," except for Keondre Long who was injured.

Ross further testified that she knew the Defendant and other passengers were affiliated with the Crips street gang. However, she stated that she was unfamiliar with the 88 Holland Avenue house and its residents at the time of the shooting. She also claimed that she did not know what the men were going to do when she picked them up but admitted that on the way to the church, "I had in mind that they [were] fixing to shoot or do something, but I just could [not] put a finger on what exactly they [were] gonna [sic] do." She stated that she had considered leaving the Defendant and the other men when she got to the church but said that "I did [not] know what do to. I just waited."

On cross-examination, Ross testified that she left her son at the Defendant's grandmother's house because there was not room for his car seat. She also said that she was not affiliated with a gang and only drove the men "because [the Defendant] was my boyfriend and he asked me to take them[.]" She further stated that the men were gone from her vehicle for two to three minutes during the shooting and that she remembered hearing more than five gunshots during that time. She maintained that she did not know Jonathan or Joshua Swift at the time of the shooting but was aware that there was conflict between the Crips and Vice Lords that involved "back and forth shooting." She also admitted that when she was taken to jail after the car wreck, she made a false statement that the men "had put a gun to [her] head" and forced her to drive them. She conceded that she was never held at gunpoint. On redirect, Ross testified that it was about a five-minute drive from where she picked up the Defendant to the church parking lot where the men exited the vehicle.

Investigator Ron Pugh of the Jackson Police Department testified that he was the primary investigator for the November 11, 2013 shooting at 88 Holland Avenue. On November 12, he conducted a search of the church located at the intersection of Cloverdale and Holland, less than half a block from 88 Holland Avenue. He recovered four .38 caliber shell casings from the church parking lot, which matched the caliber of the revolver used in the shooting.

Jackson Police Department patrol officer Michael Byrd testified that on November 11, 2013, he responded to a call that shots had been fired into the residence at 88 Holland Avenue. When he arrived, he spoke with Donnell Jeter to determine if anyone was injured during the shooting. He then took photographs of the house, including the photograph of the bullet hole in Jonathan Swift's bedroom. Officer Byrd also stated that he discovered three .40 caliber shell casings, two 9-millimeter shell casings, and five 9-millimeter live rounds in the area near the house.

Sergeant Chris Chesnut, of the Jackson Police Department major crimes unit, testified that he took a statement from the Defendant on November 12, 2013, regarding the November 11 shooting at 88 Holland Avenue. After the Defendant waived his Miranda rights, Sgt. Chesnut handwrote the Defendant's statement, which read as follows:

> Last night I was at 123 Walsh Street with my cousins and their friend. I called Shenqua and told her to come pick me up. When she got there, we got in the car. We had guns with us for protection. I told Shenqua to drive us and told her where to go. I told Shenqua to stop on Holland Avenue and we got out. Shenqua pulled up to the church. We had gone to the Vice Lord house because they had been attacking us. I had a Tec-9 9-millimeter. I fired two rounds at the house and the gun jammed. All four of us walked up to the house. I heard shots other than mine, but I did not know who fired them. The reason I shot at this house is because the people inside the house are responsible for shooting at my house more than one time. After we shot, we ran back to Shenqua's car at the church. We got in the car and we were going back to Walsh Street. The police got behind us on Lexington. Shenqua wrecked the car. I ran and hid by the school buses and then in the woods. I made it to Walsh Street and told them what had happened. I left there and went home to Preston Street.

The Defendant reviewed the statement and added the line, "I, Corey Gray, did not shot [sic] at this house last Monday" in his own handwriting. He then signed the statement on November 12, 2013, at 11:28 p.m. On cross-examination, Sgt. Chesnut confirmed that the Defendant admitted to firing two rounds at 88 Holland Avenue on November 11,

2013. He also clarified that the handwritten sentence that the Defendant added was in reference to a shooting at 88 Holland Avenue that had occurred the week before.

Following their deliberation, the jury convicted the Defendant as charged. In addition, the jury imposed a $25,000 fine for each count of attempted first degree murder, a $5,000 fine for each count of aggravated assault, a $5,000 fine for each count of employing a handgun during the commission of a dangerous felony, and a $3,000 fine for the evading arrest conviction.

**Sentencing Hearing.** At the December 14, 2014 sentencing hearing, the parties agreed that the Defendant would be sentenced as a Range I, standard offender. The presentence report, admitted without objection, reflected that the Defendant, age twenty-eight, had a previous criminal history consisting of two convictions for driving on a suspended license and a conviction for evading arrest. Certified copies of these convictions were introduced without objection. The State further noted that the Defendant was convicted in the present case while he was still serving the eleven month, twenty-nine day sentence for his driving conviction. The Defendant's presentence report also included victim impact statements from Kimberly Jeter, Donnell Jeter, Jonathan Swift, and Dontavius Jeter. Each of the four victims emphasized the significant emotional impact of the November 11 shooting.

Sergeant Chris Chesnut of the Jackson Police Department testified that on November 12, 2013, he took a statement from the Defendant regarding the Defendant's involvement in the Holland Avenue shooting. He also took the Defendant's statement about a different incident that occurred on November 9, 2013, in the Madison County Sheriff's Department parking lot. Sergeant Chesnut said that the November 9 incident involved the Defendant, two other adults, Frank Bonds and Guelda Lewis, and two minor children. After waiving his Miranda rights, the Defendant made the following statement regarding this incident:

> Saturday morning I was driving my girlfriend's white Trailblazer. I was in the downtown area when I saw a person I know as Nitty. He was a passenger in a vehicle. I do not know who was driving. I remember seeing them around Lexington and Hays. I started following the vehicle but I was not chasing them. I wanted to kick Nitty's a**. Nitty had shot at my house on Preston Street earlier this year. I believe he also had sent people to shoot my house the second time. I was pissed off because my kids were in the house when he shot at it. This was the first time I have seen him since the shooting. I shot at the vehicle twice on college Street. The vehicle turned into the sheriff's department lot. I kept driving and went to the store. I went home and got my clothes for work. I went to work at Burger

King on North Highland around 12:30 p.m. I did not know he had kids in the car when I shot at him. I did not see the kids. I would never had [sic] shot if I had known they were in the car. I found out about the kids from the news. At the time of the shooting I was alone in the vehicle. The gun I used was a .38 revolver. I gave my gun to my family member to get rid of it.

The Defendant reviewed and signed the statement, and he added the following:

I would like to say that as a father of five kids, had I knew that children were in that car, I would not have been shooting at all. I am truly sorry for all of my actions that day. Please believe me when I say I'm so sorry that baby being shot up in that.

On cross-examination, Sgt. Chesnut testified that the Defendant was cooperative and seemed to showed sincere remorse.

After the State's proof, the Defendant's twenty-seven-year-old younger sister, Cabrina M. Allen, testified that the Defendant was a hard worker and the provider and protector of their family. She said that the Defendant would benefit from "the proper guidance and . . . a little rehabilitation of a jail sentence" but stated that "an amount of 100 plus years" was excessive. She also requested leniency from the court for the sake of the Defendant's children.

The Defendant's mother, Alisa Gray, described the Defendant as "intelligent," "family oriented," and "an excellent father," noting that he has always worked to provide for his family. She stated that while she did not agree with the Defendant's actions, she believed he was "a victim of his environment" but still "a good person." She repeatedly asked the court "for leniency and mercy upon my son."

Deshawna Black, the mother of the Defendant's five children, testified that the Defendant was a "wonderful father" and always provided for his children. Regarding the Defendant's criminal conduct, she testified, "I do [not] know this bad person because he do[es] so much good," but she did not excuse his actions. Although she agreed that "[h]e do[es] deserve time," she urged the trial court to lessen his sentence.

Finally, the Defendant made the following statement:

Your Honor, I just would like to say that I [am] sorry to the Jeter family and the Swift family. I just want them to know that I was deeply sorry for

what I did. I know what I did was wrong. That [is] pretty much it. I [am] willing to accept my punishment however it goes, sir.

After hearing the proof and arguments from counsel, the trial court applied four enhancement factors and found that the Defendant: had a previous history of criminal convictions or criminal behavior; was a leader in the commission of the offenses, which involved two or more criminal actors; failed to comply with conditions of a sentence involving release into the community; and that the Defendant was adjudicated to have committed a delinquent act or acts that would constitute a felony if committed by an adult. See T.C.A. § 40-35-114(1), (2), (8), (16). Although the trial court noted the Defendant's assertion that he "acted under strong provocation," the court did not find any applicable mitigating factors.

After merging the four aggravated assault and attempted first degree murder convictions, the trial court imposed consecutive sentences of twenty years for each of the four attempted first degree murder convictions, six years at 100 percent for each of the four employing a firearm convictions, and one year and six months for the evading arrest conviction. The trial court ordered each of the employing a firearm sentences to be served consecutively to each of the attempted murder sentences, and the evading arrest sentence to run consecutively to those sentences, for a total effective sentence of 104 years in confinement with eighty years to be served at thirty percent and twenty-four years to be served at 100 percent. The court entered the judgment on December 23, 2014, and the Defendant filed a timely motion for new trial. After a hearing, the trial court denied the motion for new trial and this timely appeal followed.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant argues that there is insufficient evidence to sustain each of his four attempted first degree murder convictions. In contesting the sufficiency of the evidence, the Defendant concedes that he fired shots at 88 Holland Avenue on November 11, 2013. However, he argues that the evidence is insufficient to establish premeditation, which entails a previously formed intent to kill. To support this contention, he claims that his motive was retaliation rather than intent to kill, noting that he told Sgt. Chesnut that he acted out of retaliation against the Vice Lords and that he intended only to shoot the house rather than the victims inside the house. The State responds that the evidence presented was sufficient to establish each of the four attempted murder convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." When considering the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

As relevant in this case, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." T.C.A. § 39-12-101(a)(2). First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2006). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

"Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the

mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citing Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). This court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted).

Here, the Defendant argues that his testimony at trial established that he did not intend to shoot any of the four victims inside 88 Holland Avenue, and therefore, the evidence is insufficient to establish premeditation. We disagree. As noted above, premeditation is a question of fact reserved for the jury and no particular set of facts is necessary to establish its existence. The jury may infer premeditation from any number of facts and circumstances surrounding the offense. The evidence in this case demonstrates that the Defendant and other shooters had a preconceived plan to carry out the Holland Avenue shooting. The Defendant admits that on November 11, 2013, he directed his then girlfriend, Shenqua Ross, to drive him and three other men to 88 Holland Avenue, which he identified as "the Vice Lord house." Testimony from the four victims at trial confirms that two of the residents of 88 Holland Avenue were previously or currently affiliated with the Vice Lords and other members of the gang frequently spent time there. On their way to the Holland Avenue house, the Defendant and other male passengers carried firearms and wore bandannas to cover their faces. The Defendant admits that he walked up to the house and fired two rounds from his Tec-9 nine-millimeter handgun before it jammed. He also stated there were shots besides his own being fired. The physical evidence taken from the scene, including multiple shell casing and live rounds, corroborates the Defendant's admissions. In addition, police discovered a bullet hole in the window of Jonathan Swift's bedroom at 88 Holland

Avenue that all four victims testified was not there prior to the shooting.

The Defendant stated that he shot at the house "because the people inside the house are responsible for shooting at my house more than one time." This admission is supported by Ross's testimony that the Defendant and other passengers were affiliated with the Crips street gang and the fact that two residents of 88 Holland Avenue were affiliated with a rival street gang. Although the Defendant emphasizes that his actions were retaliatory and that he "went to the Vice Lord house because they had been attacking us," his admissions and underlying retaliatory motive are sufficient to demonstrate premeditation. The Defendant further points out that each of the victims "testified that they were not injured and did not observe anyone attempting to gain access to the residence to inflict further injury." However, it is sufficient for purposes of attempt that the Defendant "had done everything [he] believed necessary to accomplish" first degree murder. See T.C.A. § 39-12-101(a)(2), cmts. Here, the Defendant had Ross drive him to the "Vice Lord house" while he was carrying a gun and wearing a bandanna over his face and intentionally fired multiple, close-range shots at the house. Upon our review, there was sufficient evidence for a rational juror to conclude that the Defendant acted with premeditation and intent to commit first degree murder.

**II. Sentencing.** On appeal, the Defendant argues that the trial court imposed excessive sentences. He broadly asserts that "the sentence imposed was not done so in accordance with the Tennessee Criminal Sentencing Act, Tenn. Code Ann 40-35-101, et. seq., and that the sentence is excessive under the sentencing considerations set out in Tenn. Code Ann. 40-35-103 and 40-35-210." He further claims that the trial court failed to make the requisite findings to support consecutive sentencing. The State responds that the trial court did not abuse its discretion in sentencing the Defendant. We agree with the State.

The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Pursuant to the 2005 amendments to the Sentencing Act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b)(1)-(7) (2010). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d) (2010), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103 (2010). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

First, the Defendant argues that "the effective length of the sentence[s] . . . are excessive under the facts." From the outset, we note that the parties agreed that the Defendant would be sentenced as a Range I, standard offender. For attempted first degree murder, a Class A felony, the appropriate sentencing range was fifteen to twenty-five years' at thirty percent. See T.C.A. §§ 39-13-202, 40-35-112(a)(1). For employing a firearm during the commission of a dangerous felony, a Class C felony, the appropriate sentence was a mandatory six years served consecutively. See T.C.A. § 39-17-1324(b)(2), (h)(1). For evading arrest, a Class E felony, the appropriate range was one to two years at thirty percent. See T.C.A. §§ 39-16-603, 40-35-122(a)(5). Thus, the trial court's sentences were well within the appropriate statutory ranges.

The Defendant also contends that the trial court erred in its application enhancement factor (1), that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. See T.C.A. § 40-35-114(1). However, the record supports the trial court's application of factor (1), as the presentence report lists three prior convictions for the Defendant and certified copies of these convictions were introduced at the sentencing hearing. The Defendant does not dispute the existence or validity of any of these prior convictions. Although the Defendant notes that his prior adult criminal history consisted of non-violent misdemeanor convictions, he fails to demonstrate any legal basis for why this would render the application of factor (1) improper. Here, the Defendant does not

- 13 -

challenge the trial court's reliance on enhancement factors (2), (8), or (16), and we conclude that the record supports their application.

Next, the Defendant appears to argue that the trial court should have mitigated his sentences based on his sincere remorse and acceptance of responsibility. He also points to his work history and the testimony of his family and loved ones at sentencing "that he was a good father, provider, and protector of his family." Although the record reflects that the Defendant was sorry and accepted responsibility for his behavior, he has not otherwise shown the impropriety of his sentences. We note that we are bound to a trial court's imposition of a within-range sentence that is otherwise consistent with the purposes and principles of the Sentencing Act, even if we would have preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). Because the statutory enhancement and mitigating factors are advisory only, and because "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion[,]" we conclude that the trial court did not err in its sentencing determinations where the record otherwise supports the within-range sentences imposed. See T.C.A. § 40-35-114(c)(2) (2010); Carter, 254 S.W.3d at 345; see also Bise, 380 S.W.3d at 709 (upholding a mid-range sentence despite finding that the single enhancement factor had been improperly applied). Here, the record supports the length of the sentences imposed by the trial court.

Finally, the Defendant contends that the trial court improperly imposed consecutive sentencing. Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a). The Tennessee Supreme Court has held, "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of seven categories enumerated in code section 40-35-115(b). Those categories include:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized

by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Id. § 40-35-102(1); see State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2); see Imfeld, 70 S.W.3d at 708.

The court identified two grounds supporting the imposition of consecutive sentences. First, the court determined that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See T.C.A. § 40-35-115(b)(4). With regard to the dangerous offender classification, the Pollard court explained that two additional findings must be made:

"Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to

- 15 -

protect the public from further criminal acts by the offender. In addition, the Sentencing Reform Act [of 1989] requires the application of the sentencing principles set forth in the Act applicable in all cases. The Act requires a principled justification for every sentence, including, of course, consecutive sentences."

Pollard, 432 S.W.3d at 863 (quoting Wilkerson, 905 S.W.2d at 938). Therefore, when imposing consecutive sentences pursuant to the dangerous offender classification, the trial court must conclude that the proof establishes that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." Id. (quoting Wilkerson, 905 S.W.2d at 938). Unlike the other six subsections, the trial court must make additional findings for the dangerous offender classification because it is "the most subjective and hardest to apply." State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

At the sentencing hearing, the State articulated the requisite findings for the court to impose consecutive sentencing based on the dangerous offender category:

The Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime to which the risk to human life is high. I think it [is] particularly worth noting, the circumstances of this case [are] that the Defendant called Shenqua Ross to his house, had her drive him some distance to 88 Holland. Each of these individuals were armed, and I think the proof was also at trial that the Defendant is a . . . member of the Crip street gang, and that he then went to that location armed with a Tec-9 with I believe a 30-round clip and shot at least two times before the gun jammed and then fled the scene. He was accompanied by two others. So this is something that took some degree of planning, a lot of time for reflection, a lot of time for him to turn around and say, "This is not a good idea," but yet he continued on and shot into that house. And again, the Court saw the map. That's a residential area. Not only were the people in that house put in danger, but I submit to the Court that others in the area were also put in danger.

Also the Court I think can take particular note of the fact he was involved just two days prior, this Defendant shot into a car on the parking lot of the Madison County sheriff's Department where there were two adults and a five-year-old and a one-year-old in the car. As a result, the five-year-old was grazed by a bullet. I understand the Defendant in his

- 16 -

statement may say he's sorry, but I think it indicates nothing else -- that he has no regard for human life regardless of whose it is.

So, Your Honor, I think the sentence that the state requests is reasonably related to his criminal conduct in this case. It serves as a deterrent factor, and society needs to be protected from this Defendant who was involved I would submit in a minimum of shooting at eight people within a span of roughly two days.

Here, the trial court adopted the State's arguments, emphasizing "that the circumstances surrounding the commission of the offense are aggravated," such that "[t]he confinement for an extended period of time is necessary to protect society from the Defendant's unwillingness to lead a productive life and the Defendant's resort to criminal activity in furtherance of an antisocial lifestyle[.]" The court also determined that the State "established by preponderance of the evidence the Defendant is an offender whose record of criminal activity is extensive" after "consider[ing] all of those counts" presented at sentencing. See T.C.A. § 40-35-115(b)(2). We concluded that the record supports the trial court's findings and that the court therefore did not abuse its discretion by imposing consecutive sentences.

Here, the trial court expressly weighed the factors in Tennessee Code Annotated section 40-35-210 and the sentencing principles in Tennessee Code Annotated section 40-35-103. The court noted that the crimes involved numerous victims and emphasized the emotional impact the Defendant's criminal behavior had on the victims. Out of concern for the victims and the public, the court determined that consecutive sentencing was necessary. The record reflects that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing consecutive, within-range sentences of confinement in this case. Therefore, the Defendant has failed to establish that the trial court abused its discretion in imposing an effective sentence of 104 years, and he is not entitled to relief.

## CONCLUSION

Upon our review, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE